James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

CORNING GLASS WORKS, a Corporation, Defendant.

Civ. A. No. 69-396.

United States District Court, M. D. Pennsylvania.

March 30, 1972.

Isabelle R. Cappello, Washington, D. C., Stephen K. Ernst, Philadelphia, Pa., for plaintiff.

Scott F. Zimmerman, John G. Wayman, Pittsburgh, Pa., Robert F. Cox, Wellsboro, Pa., for defendant.

## OPINION

MUIR, District Judge.

### I.  INTRODUCTION.

This suit was commenced by the Secretary of Labor on October 2, 1969, pursuant to 29 U.S.C. § 201 et seq., the Fair Labor Standards Act ("Equal Pay Act"). Plaintiff seeks to enjoin Defendant's alleged practice of wage discrimination based on sex and to obtain restitution of unpaid wages allegedly due certain female employees of Defendant.

### II.  FINDINGS OF FACT.

1.  Corning Glass Works ("Corning") is a New York Corporation having its principal offices in Corning, New York. (Stip. of Fact 2)

2.  The Wellsboro plant of Corning Glass Works is the only plant involved in this case. (Stip. of Fact 2)

3.  There are four separate jobs involved in this litigation: Inspector-Packer, Frost Light Inspector, Positioner-Inspector, and Quality Inspector. (Stip. of Fact 6)

4.  Prior to October 16, 1966, except during World War II, only female employees worked in these inspector positions on the day shifts at the Wellsboro plant. (Stip. of Fact 8)

5.  Prior to October 16, 1966, except during World War II, only male employees worked in these inspector positions on the steady night shift in the Wellsboro plant. (Stip. of Fact 9)

6.  In 1947, the differential in base hourly rates between the jobs of Inspector-Packer and Inspector-Packer Nights was 19 cents an hour, the differential in base hourly rates between the jobs of Frost Light Inspector and Frost Light Inspector Nights was 18 cents an hour, and the differential in base hourly rates between the jobs of Positioner-Inspector and Positioner-Inspector Nights was 19 cents an hour. (Stip. of Facts 36, 42, 45e)

7. On October 16, 1966, these respective differentials were 20 cents an hour, 16 cents an hour, and 20 cents an hour. (Stip. of Facts 37, 43, 45f)

8. The differential in base hourly rates between the jobs of Quality Inspector and Quality Inspector Nights has increased from 20 cents an hour in 1949 to 22.5 cents an hour on October 16, 1966. (Stip. of Facts 48, 49)

9. These differentials in base rate of pay were in addition to the plant-wide shift differential which has increased from 6 cents an hour in 1947 to 12 cents an hour in 1966 for steady night work. (Stip. of Facts 21–25)

10. Since October 16, 1966, by mutual agreement between the employees' certified bargaining agent and the Company, women have been permitted to exercise their seniority, on the same basis as male employees, to claim jobs on the steady night shift when vacancies occur and to bump into such jobs during periods when the work force is being reduced. (Stip. of Facts 19, 30, 38, 44, 45a, 79, 85–88, 118, 119).

11. Male and female inspectors who work on the steady night shift inspection jobs involved in this case have been and are paid at the same base hourly rate. (Stip. of Facts 37, 72, 74, 89, 104)

12. Male and female inspectors who work on the day shifts on the inspection jobs involved in this case have been and are paid at the same base hourly rate. (Stip. of Facts 73, 90)

13. A night shift worker is out of phase with community life and is usually out of phase with family life. (3 N. T. 199–200)

14. Night work, both steady and rotating, interferes with the worker's physiological (circadian) rhythms. (3 N.T. 200)

15. The first job evaluation plan at Corning's Wellsboro plant was effective from October 20, 1947, to January 18, 1965, and was called the Stevenson, Jordan and Harrison Plan. It is referred to as the SJ&H Plan. (Stip. of Fact to which Defendant Either Makes Objection or Withdraws a Prior Objection, P–39 at page 19)

16. The SJ&H Plan measured jobs by weighing the following factors: schooling, training, skill, versatility, knowledge, responsibility, surroundings, and hazards. (Stip of Fact to which Defendant Either Makes Objection or Withdraws a Prior Objection, P–50 at page 14)

17. Under the SJ&H Plan, the ratings of these factors differed for each inspector job but the ratings of the surroundings and hazards factors were the same for the day and night shifts for each job. (Stip. of Fact to Which Defendant Either Makes Objection or Withdraws a Prior Objection, P–50 at page 14)

## III. DISCUSSION.

Until October 16, 1966, except during World War II, only women worked as Frost Light Inspectors, Positioner-Inspectors, Inspector-Packers and Quality Inspectors on the day shift at the Wellsboro, Pennsylvania plant of Defendant Corning Glass Works, and only men were permitted to work on the night shift.[1] Plaintiff contends that because the male inspectors on the night shift received a higher hourly base rate of pay than the female inspectors on the day shift, in addition to a plant-wide shift differential, Defendant violated 29 U.S.C. § 206(d) (1) which provides:

"(d) (1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such em-

---

1. Both parties agree that Plaintiff is barred from recovery for any possible violations prior to October, 1966, by the applicable statute of limitations. However, Plaintiff's claim that Defendant has violated 29 U.S.C. § 206(d) (1) since that time is based on residual effects of the alleged prior discrimination. Accordingly, Plaintiff's case must fail if discrimination prior to October, 1966 is not proven.

ployees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

In my view, Plaintiff has failed to sustain its burden of proof that the male and female inspectors performed their work "under similar working conditions." Male inspectors worked on the night shift; female inspectors on the day. Plaintiff contends that the time of day worked is not a "working condition" within the meaning of the statute. Plaintiff relies in part on testimony by Defendant's expert in the field of job evaluation that time of day worked is considered a wage condition, not a working condition. (3 N.T. 207, 211–212) Plaintiff also relies on the fact that the criteria evaluated under the job evaluation plans used by Defendant did not include time of day worked, and on selected legislative history. Defendant, on the other hand, points to Murphy v. Miller Brewing Company, 307 F.Supp. 829, 835 (E.D.Wisc.1969) where the Court stated that

"[i]t is not subject to serious dispute that there is some difference in *work-ing conditions* between the first, second, and third shifts merely because the work is performed at different times of the day." (Emphasis supplied).

In addition, Defendant too relies on legislative history to support its position. In my view, time of day worked is a working condition within the meaning of 29 U.S.C. § 206(d) (1).[2] As Defendant's expert testified, night work has a significant sociological, psychological and physiological impact on most workers.[3] It is a condition of employment which can affect an employee's work more than disagreeable surroundings or exposure to hazard. It is a condition under which most people would prefer not to work.

The question remains whether despite the difference in time of day worked, the day and night inspectors worked under working conditions which as a whole were similar. It appears that except for the time of day worked, their working conditions were the same.[4] In my view, a given job performed at night and at day is not performed under similar working conditions even though all other conditions are identical. Working at night is so significant a factor that the totality of the working conditions here were dissimilar; they were not "very much alike" or "alike in substance or essentials."[5] Hence, Plaintiff has failed to prove a violation of 29 U.S.C. § 206(d) (1).

### IV.  CONCLUSIONS OF LAW.

1.  This Court has jurisdiction of the parties and subject matter of this action.

■  2.  Plaintiff has the burden of proving for each of the four inspector jobs involved in this case that male and female inspectors labored under similar

---

2.  Cf. 29 C.F.R. Sec. 800.131–132; see also Independent Oil Workers Union, Local 117, v. American Oil Co., 296 F.Supp. 650, 658 (D.Kan.1969).

3.  See Findings of Fact 13 and 14.

4.  See Findings of Fact 15–17.

5.  Webster's Third New International Dictionary, Unabridged, 1966.

working conditions but were not paid equal wages for equal work.

■ 3. Work performed on the night shift is not performed under working conditions similar to work performed on the day shifts.

■ 4. Since female inspectors worked on the day shifts and male inspectors worked on the night shift, Plaintiff has not sustained its burden of proof that male and female inspectors labored under similar working conditions.

5. Plaintiff has not proven any violation of 29 U.S.C. § 206(d) (1).

An order in accordance with this Opinion will be entered.[6]

### SUPPLEMENTAL FINDINGS OF FACT

#### A. Historical Background

1. Plaintiff claims a violation of the Equal Pay Act only with respect to employees who were hired prior to January 20, 1969. No violation is claimed at this time with respect to employees hired subsequent to January 20, 1969. (Stip. of Fact 121)

2. The steady night inspection jobs were created between 1925 and 1930 because of the introduction of automatic production equipment which made it necessary to inspect ware on all shifts. (Stip. of Fact 10)

3. At the time of the institution of inspection work on the night shift, and until 1947, Pennsylvania law absolutely prohibited the employment of women between the hours of 12:00 p. m. and 6:00 a. m. (Stip. of Fact 15). Thus, men had to be hired for this first night inspection shift.

4. These men were selected from male employees within the plant. (Stip. of Fact 13)

5. These men were paid the individual, personal rates they were already receiving which were higher than the rates being paid to women doing inspection work on the day shift. (Stip. of Fact 13)

6. At the time of the institution of inspection work on the night shift, Corning did not pay shift differentials. (Stip. of Fact 11)

7. During at least part of World War II, women were employed on the steady night shift as inspector-packers. (1 N.T. 203; 3 N.T. 132). There is no evidence that these women did or did not receive the same wages as the male inspector-packers working at night.

8. In 1947, Pennsylvania law was amended to permit women to work at night conditioned upon the approval of the State Department of Labor (Act of May 21, 1947, P.L. 389, Sec. 4). The State regulations provided, among other things, that in order to be permitted to employ women at night an employer was required to furnish transportation where public transportation was not available. (Stip. of Fact 16)

9. Public transportation has not been available in Wellsboro, Pennsylvania. (Stip. of Fact 18).

10. It has not been economically feasible for Corning to furnish transportation to its female employees. (3 N.T. 195–196)

11. In 1944 the American Flint Glass Workers' Union of North America negotiated a collective bargaining agreement covering many production and maintenance employees of Corning Glass Works, Wellsboro plant, including the inspectors who worked on the inspection jobs involved in this case. (Stip. of Fact 21)

12. This contract provided that, for the first time, all employees working a non-rotating night shift would receive a

---

6. In the event that the Court of Appeals for the Third Circuit should decide that my reasoning is erroneous, I have filed "Supplemental Findings of Fact." These are not necessary to my decision, but might be helpful to that court in reaching an opposite conclusion or might eliminate re-litigation of these issues if the case has to be re-tried.

shift differential as a premium for such night work. (Stip. of Facts 22 and 23)

13. In addition to this new "shift differential" applicable to all night workers, this contract continued in effect the existing differential in base rate of pay between the employees on the steady night shift *inspection* jobs and employees on the day and afternoon shift *inspection* jobs. (Stip. of Fact 23)

14. All collective bargaining agreements entered into by Corning with the Union, between the years 1944 and 1969 continued to maintain the differential in base rate between the steady night shift inspection jobs and the day and afternoon shift inspection jobs, except for minor variations caused by the negotiation of percentage rather than flat rate increases. (Stip. of Fact 24)

15. The following jobs were performed exclusively by men on all shifts at least until October 17, 1966:

| Job Code | Job Title | Group No. |
|---|---|---|
| 1836 | Industrial Truck & Equipment Opr. | 7 |
| 2015 | Head Mixer | 10 |
| 4007 | Glass Melting Furnace Operator | 11 |
| 4031 | Optical Reader Forehearth & Lehr Opr. | 14 |
| 2181 | Cng. Rbn. Mch. Operator—Class B | 14 |
| 2184 | Relief Attendant | 10 |
| 2280 | Cng. Rbn. Mch. Operator—Class A | 18 |
| 1053 | Hiker | 3 |
| 3838 | Traying Machine Operator | 5 |
| 4457 | Frost Operator | 8 |
| 4466 | Misc. Frost Operator | 9 |
| 3608 | Opr. Cut & Finishing Machine | 9 |
| 3716 | Ceramic & S & L Operator | 9 |
| 5711 | Sahara Operator | 9 |
| 5739 | Finishing Equipment Mechanic | 11 |
| 0850 | Ind. Truck Driver & Checker | 8 |
| 5728 | Shift Maintenance Mechanic | 13 |
| 6213 | Electrician—Class A | 16 |
| 6214 | Electrician—Class B | 12 |
| 5224 | Packing Equipment Operator | 7 |
| 5287 | Attendant Hamper Maker & Sealer | 4 |

(Plaintiff's Exhibit 1, p. 13)

16. With respect to these jobs, the base hourly rate has been the same on all shifts. (Plaintiff's Exhibit 1, p. 13)

17. On July 17, 1965, the State regulations were amended to provide that an employer in a manufacturing establishment could employ women between the hours of 10:00 p. m. and 6:00 a. m. if that employer arranged for adequate transportation for women workers or if prompt public transportation was available or the individual worker had regular private transportation. CCH State Wage and Hour Citator Paragraph 57,849. (Stip. of Fact 17)

18. Beginning on October 16, 1966, Corning has employed women between the hours of 12 midnight and 6:00 a. m. without providing transportation. To the best of Defendant's knowledge, these employees have regular private transportation. (Stip. of Fact 19)

19. The job of Positioner-Inspector on the night shift was eliminated on September 11, 1966, and since that time it has been performed only on the day shift. (Stip. of Fact 53; cf. Stip. of Fact 45f)

B. Differences Between the Night and Day Inspector Shifts

20. The primary duties of men and women working as Inspector-Packers, Positioner-Inspectors, Frost Light Inspectors and Quality Inspectors do not depend on which shift is being worked. Stip. of Facts 33, 41, 45d, 46; 1 N.T. 7–8, 128, 143–150, 156–158, 164–193; 2 N.T. 44–65, 86–90, 93–94, 95–98, 103–108, 112–120; 3 N.T. 105–106, 134–136, 139–140, 147–154, 155–185, 189–192, 194)

21. Male inspectors on the steady night shift have performed additional duties requiring substantially greater physical effort, including heavy lifting and pushing, than jobs having the same titles on the day shifts. Only men have performed such duties, and most women could not perform many of these duties. (Stip. of Facts 34, 35, 64; 1 N.T. 170–184, 193, 198; 2 N.T. 104–109, 112–116, 197–213, 215–235; 3 N.T. 104–105, 108, 135–140, 149, 155–164, 168–172; Defendant's Exhibits D1–D85)

22. These duties are not included in the duties of these jobs on the day shifts. (2 N.T. 106–107, 215–216, 226–227).

23. On the day shifts, these duties are usually performed by "Hikers," traditionally males (Stip. of Fact 66)

24. On October 16, 1966, the maximum base rate of pay for Hikers was higher than that for night shift inspectors but lower than that for day inspectors (excluding shift differentials). (Stip. of Facts 75, 45f, 43, and 37)

25. On the day shifts, male inspectors who are called upon to perform the job of Hiker carry a multiple rate and receive the rate for the job of Hiker when performing the job of Hiker. This is also true of any male inspectors on the night shift with seniority after January 20, 1969, but not of male inspectors on the night shift hired prior to January 20, 1969, who continue to receive their inspection rate even when performing Hiker duties. (Stip. of Fact P–112 at page 24)

26. The heavy aspects of the Hiker job are lightened to the extent necessary by assigning as many men as are needed to accomplish it (2 N.T. 198–203; 3 N.T. 44, 183); by using mechanical aids (2 N.T. 198–202, 226; 3 N.T. 42, 183–184); and by rotating the men between the tiring duties and the lighter duties. (2 N.T. 223)

27. There are approximately the same number of Hikers on all shifts. Three to 13 men work as Hikers assisting inspectors on the morning and afternoon shifts. Three to 13 men work as Hikers assisting inspectors on the night shift. (Stip. of Fact 67; 3 N.T. 35)

28. The amount of time male inspectors on the steady night shift spend performing heavy manual labor varies from day to day and from person to person. (Defendant's Exhibits D1–D85)

29. Male inspectors on the night shift have spent about 25 to 30% of their time doing manual labor, heavy and light. (3 N.T. 104–108, 111, 138–139)

30. Some of the time which these male inspectors on the night shift spent performing manual labor was due to an excess of inspectors on that shift. (1 N.T. 189)

31. Although there is a wide variance from day to day and from person to person in the amount of time male inspectors on the night shift spend performing manual labor, they are all always paid at the same base hourly rate (aside from considerations of seniority) without regard to the nature and frequency of their performance of manual labor. (Stip. of Facts 37, 43, 45f)

32. A male inspector on the night shift who at times has been physically unable, due to illness, to perform the heavier aspects of Hiker work has not had his pay reduced. (2 N.T. 93–94)

33. Since October 16, 1966, when women first were permitted to apply for night shift inspector jobs, they have not had to perform manual labor at night. (2 N.T. 235)

34. During interruptions, at times, some inspectors on all shifts are assigned to the reinspection belt. The reassigned female inspectors and some of the reassigned male inspectors on all shifts engage in inspecting and repacking the ware at the belt. The inspection at this belt is primarily for broken bulbs. This is work within the Inspector-Packer job classification. (Stip. of Fact 63)

35. In addition, the female employees who have performed the inspector jobs involved in this case since October 2, 1966, generally have been and are available for and at times have been assigned to other jobs involving a great variety of duties, some of which require greater effort, skill, and responsibility and are performed under different working conditions than their inspector job.

36. Women inspectors are occasionally required to lift boxes weighing 30 pounds or more. (3 N.T. 161)

37. The only differences between the jobs of Quality Inspector and Quality Inspector Nights are that the latter generally (1) make the final decision to withhold glass or let it pass without consulting with a foreman; and (2) set their own machines in case of changeover. (1 N.T. 7–8, 3 N.T. 189–194)

### C. Job Evaluation Plans

38. Under the Corning Glass Works (CGW) Plan of job evaluation, which was installed on January 20, 1969, all employees hired after January 20, 1969, are paid the evaluated base wage rate for that job without regard to whether they work at night or during the day or whether they are men or women. (Stip. of Fact 101)

39. From October 20, 1947, to January 17, 1965, Defendant maintained separate rate schedules for males and for females. (Stip. of Fact P–60 at page 21)

40. Until October 16, 1966, Defendant maintained separate seniority lists for males and females. (Stip. of Fact 77)

41. Under the separate rate schedules for men and women, male inspectors working the steady night shift were paid a higher base hourly rate than the day and afternoon female inspectors who performed work rated at the same points by Defendant's SJ&H Plan. (T–20, 21, 60 and 61 to Plaintiff's Exhibit G)

42. The SJ&H plan provided for calculating the basic wage rates for men by converting the total values of the jobs evaluated under the plan to a rating factor and multiplying the rating factor by the unskilled labor rate of the vicinity for men. The same procedure was followed for calculating the basic wage rates for women except the unskilled labor rate of the vicinity for women was used to obtain the female rate. (Page 13 of Exhibit J to Plaintiff's Exhibit 1)

43. Effective, January 18, 1965, Defendant merged the separate male and female schedules into one revised rate schedule (Stip. of Fact P–69 at page 22)

44. This merger, however, preserved the differentials in maximum base rate between the male and female inspectors. Some of the subordinate rates were changed very slightly. (Stip. of Facts 37, 43, 45f and 49; pages 192–194 of Plaintiff's Exhibit 6)

45. Under the CGW plan, the wage rate is the same on all three shifts and for both sexes for all inspectors hired after January 20, 1969. (Stip. of Fact 102)

### D. Effect of the Changes since October 16, 1966, on Wages Paid to Inspectors

46. Women must wait for vacancies in night shift jobs to occur unless they bump into such jobs in the event of a reduction in force. (Stip. of Fact 44)

47. In the event of a force reduction in a particular job, employees on the job for less than 84 days are dismissed first from that job, in order of plantwide seniority. (Stip of Fact P–83 at page 22)

48. Beginning October 16, 1966, a number of female employees have availed themselves of the opportunity to take the higher-paying night shift inspection jobs. (Stip. of Facts 80 and 88)

49. Several females who were first hired on March 14, 1967, immediately began work as Inspector-Packers on the steady night shift that same night. (4 N.T. 10–11)

50. A male who was hired on September 20, 1966, began work as a Frost Light Inspector on the steady night shift on June 10, 1967. (4 N.T. 12)

51. Another male, hired on May 9, 1966, began work as a Quality Inspector on the steady night shift on March 31, 1967. (4 N.T. 12)

52. All qualified employees of the Wellsboro plant who had greater seniority than the employees listed in the previous three paragraphs could have claimed the steady night shift inspection jobs on the dates those employees began work on those jobs. (4 N.T. 13–16)

53. Since 1944 every collective bargaining agreement has contained Article 15, section 2, which provides:

"When job evaluation * * * results in wage brackets lower than prevailing rates then paid for the job it is not the intention of the company to reduce the prevailing base rates of employees currently working on such jobs."

(Stipulation 108)

54. Paragraph 9 of Schedule A of the installation rules of the CGW Plan provides:

"Any employee who as of the date of the installation of the CGW Hourly Job Evaluation Plan is an employee of the Wellsboro plant covered by the terms of the Basic Agreement and who thereafter by operation of rights under the Basic Agreement continues to hold or takes any of the jobs specified on the (night) shift shall receive the rate which he or she would have received for that work under pre-existing practices. Those jobs being:

Inspector-Packer (N)

Positioner-Inspector (N)

Frost Light Inspector (N)

Quality Inspector (N)

Persons who become employees after the date of installation shall be paid the evaluated rate when they perform work on any of the evaluated jobs."

(Stipulation 109)

55. The rates paid under paragraph 9 of Schedule A are called "red-circle" rates by Corning. (Stipulation 111)

56. Because of these "red-circle" rates, all inspectors (male and female) employed before January 20, 1969 working on the steady night shift receive a higher base wage rate than their counterparts of comparable seniority working on the day shifts. (Stip. of Facts 103, 104)

57. This "red-circle" rate will not be paid to employees hired after January 20, 1969. (Stip. of Fact 113).

58. Since October 16, 1966, a few male inspectors have taken day and afternoon inspection jobs with concomitant reduced base hourly rate. (Stip. of Facts 117, 73, 37, 43, 45f and 49)

### E. Wilfulness

59. At least since May 4, 1964, Defendant has been aware of the Equal Pay Act because on that date, one of Defendant's attorneys advised Wellsboro officials of the Act and its implications, and told them to refer any possible violations to officials in Corning, New York. (Stip. of Fact P–6 at page 5)

60. On January 24, 1966, Corning was advised by an investigator for the Department of Labor that Defendant was in violation of the Equal Pay Act at its main plant in Corning, New York, in that female inspectors on the day shifts were being paid lower base hourly rates than their male counterparts on the night shift. The investigator stated that the Department's position was that the base hourly rates of the women should be raised to that of the men and restitution paid. (Stip. of Fact P–11 at page 6)