James D. HODGSON, Secretary of Labor, United States Department of Labor, Appellee,

v.

CORNING GLASS WORKS, a corporation, Appellant.

Nos. 252, 349, Dockets 72–1229, 72–1230.

United States Court of Appeals, Second Circuit.

Argued Jan. 4, 1973.

Decided Feb. 2, 1973.

Carin Ann Clauss, Associate Sol. (Richard F. Schubert, Sol. of Labor, Francis V. LaRuffa, Regional Sol., Donald S. Shire, Helen W. Judd, Isabelle R. Cappello, and Sylvia S. Ellison, Washington, D. C., of counsel), for appellee.

Scott F. Zimmerman, Pittsburgh, Pa. (Reed, Smith, Shaw & McClay, John G. Wyman, and Walter P. DeForest, Pittsburgh, Pa., of counsel), for appellant.

Before FRIENDLY, Chief Judge, KAUFMAN, Circuit Judge, and HOLDEN,* District Judge.

FRIENDLY, Chief Judge:

This appeal marks this Court's first encounter with the Equal Pay Act of 1963, 29 U.S.C. § 206(d), one of the many beneficent remedial statutes enacted during the last decade which create new tasks for the federal courts. The burden is increased, perhaps needlessly, because, as is the case with other provisions of the Fair Labor Standards Act of which it forms a part, the Equal Pay Act has no provision for administrative fact-finding.

The controlling statute, 29 U.S.C. § 206(d)(1), of seeming simplicity, reads as follows:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

## I.

Since the parties broadly accept the factual findings of the district court, a brief summary will suffice.

The controversy concerns the wages paid by Corning Glass Works ("Corning") to Class B, Class C, and General

---

* Chief Judge of the District Court for the District of Vermont, sitting by designation.

TV inspectors,[1] in its A Factory, B & C Factory, and Pressware Plant at Corning, New York. Prior to 1925, Corning operated its plants only during the day, and found it unnecessary or undesirable to have a night shift. Between 1925 and 1930, however, the introduction of automatic production equipment made it necessary to institute a night inspection shift. Although, as the district judge found, Shultz v. Corning Glass Works, 319 F.Supp. 1161, 1170 (W.D.N.Y.1970), previously "women had filled most, if not all, of the inspection jobs on the day and afternoon shifts," New York law[2] then prohibited the employment of women between 10:00 P.M. and 6:00 A.M., and thus Corning had to recruit male employees for a steady night shift. They demanded and received wages comparable to what they were earning on other, often more demanding jobs in the plant, which were approximately twice those paid to the female inspectors. The base rate for the inspectors on the night shift was 53 cents per hour, as against 24 to 28 cents per hour for the female inspectors on the day shifts.

Thus a situation was created where the night inspection shift was all male, the day shift virtually all female, and the males received wages significantly higher than the females. This state of affairs persisted until the effective date of the Equal Pay Act—and beyond it— except for one brief period when, because of labor shortages during World War II, New York allowed women to work at night; women employed by Corning on the night shift during that period received the same wages as the men when they performed the same work. In 1944 the Corning, New York plants were organized by the American Flint Glass Workers Union and a collective bargaining agreement was negotiated which provided for the company's first plant-wide night shift differential.[3] But this change in Corning's wage structure did not eliminate the higher base wage paid to male night inspectors since, in the case of the inspectors, the shift differential was superimposed upon the existing difference in wage scales. Similarly, although in 1953 New York changed its law to permit females over the age of 21 to work after midnight in factories operating multiple shifts where the Industrial Commissioner found transportation and safety conditions to be satisfactory and granted approval,[4] the record does not reveal any application by Corning for such approval prior to 1966.

The Equal Pay Act became effective with respect to Corning's Corning, New York plants on June 11, 1964.[5] Since Corning had previously maintained separate "male" and "female" rate schedules plant-wide, with the latter materially lower, the Act clearly called for action on its part. Corning therefore merged

---

1. Although the Secretary of Labor previously claimed that the wages paid to a fourth class of employees, TV Inspectors, also violated the Equal Pay Act, the district court seemingly held that the Secretary had not met his burden of proof that the work done by men and women on these jobs was equal and did not include these jobs in its back pay award. See Shultz v. Corning Glass Works, 319 F.Supp. 1161, 1168, 1171 (W.D.N.Y.1970). The Secretary has not appealed this aspect of the district court's order.

2. 1927 N.Y.Laws, ch. 453; 1930 N.Y. Laws, ch. 868.

3. The record does not reveal whether, apart from the inspectors, Corning had paid more for night work before the institution of the plant-wide differential in the 1944 agreement. Corning suggested that there might have been other jobs performed by women during the day for which the company had to pay a higher wage to get men to perform at night. It seems relatively clear, however, that if a job had been performed on the day shift by men, men on the night shift would receive the same wage.

4. 1953 N.Y.Laws, ch. 708, amending N.Y. Labor Law § 172, now N.Y. Labor Law § 173(3)(a)(1) (McKinney's Consol. Laws, c. 31, 1965).

5. It was stipulated that the statute of limitations barred all claims arising prior to November 1, 1964 and that any back pay awards in this action should run only from that date.

the separate schedules into one. However, so far as concerned the inspectors, this was a matter of theory only, since the day shift inspectors were assigned to lower wage groups, see 319 F.Supp. at 1165–1166. Thus, as the district court found, 319 F.Supp. at 1166, "the merger continued the historical difference in base hourly rates of the men and women inspectors working the three shifts."

Corning's first significant step toward eliminating the differential wage rates for male and female inspectors took place on June 1, 1966, when it opened the inspection jobs on the night shift to women, presumably with the approval of the State Industrial Commissioner. At this time Corning consolidated its theretofore separate male and female seniority lists, and women became eligible to bid for the higher paid night inspection jobs when vacancies occurred. It is undisputed that a considerable number of women took advantage of this opportunity; turnover in the night inspection jobs was substantial and over half the vacancies were taken by women. Still, the process required some time since women could not exercise their seniority to "bump" a less senior male night inspector.[6]

The last significant event was Corning's negotiation of a new collective bargaining agreement with the Flint Glass Workers Union, effective January 20, 1969. This abolished the separate base wage rates of day and night shift inspectors and increased the rate for all inspectors, so that the resulting base wage was the same for all three shifts and exceeded the wage rates on the steady night shift previously in effect. If the agreement had stopped at that point, there could be no substantial claim of further violation of the Equal Pay Act. However, the agreement provided for a higher "red circle" basic rate to every person employed before January 20, 1969, when working as an inspector on the night shift. At the time of the last hearing in the district court, over two years after the new agreement went into effect, all the night inspectors were being paid at the "red circle" rate; unless Corning changes its system, this is likely to continue for some time since at the date of the hearing over 500 laid-off inspectors had to be offered reemployment before any new inspectors could be hired.

The district court held that Corning had been in continuing violation of the Equal Pay Act; directed it to pay the night rate to all inspectors from November 1, 1964, see note 5 *supra*, to January 20, 1969, and the "red circle" rate thereafter to all inspectors until true equalization was effected; awarded interest at the rate of 6% per annum on the amounts withheld; and issued an injunction against future violations of the Act of any kind with respect to all categories of employees at all plants except the branch plant at Wellsboro, Pennsylvania.[7] Corning claims that it was never in violation of the Equal Pay Act; that if it was, any violation ended on June 1, 1966, when women became eligible to work on the night shift, or, at latest, on January 20, 1969, when the differences in basic wage rates were abolished; and that the broad injunction was unjustified. Although the issues are not free from doubt, we reject all contentions save the last.

## II.

The parties are in agreement on the general approach we should follow. The initial question is whether the

---

6. In 1966 only 4 of 15 women requesting transfer to the night shift received this. The situation later improved so that 39 out of 61 requests were honored in 1967, and 42 out of 52 through November 7 in 1968.

7. The reason for the exception was that an action with respect to the Wellsboro plant, on facts similar to those in the instant case, was then pending in the District Court for the Middle District of Pennsylvania. This has since been decided in favor of Corning, Hodgson v. Corning Glass Works, 341 F.Supp. 18 (1972), and is now on appeal to the Third Circuit.

inspection jobs on the day and night shifts constituted "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." The Secretary has the burden on this, Shultz v. American Can Co., 424 F.2d 356, 360 (8 Cir. 1970); Hodgson v. Brookhaven Gen'l Hosp., 436 F.2d 719, 722 (5 Cir. 1970), and, if he has not sustained it, the complaint must be dismissed even if the wage differentials were unreasonably large in comparison with the actual differences in skill, effort, responsibility, or working conditions, and were based on discriminatory motivation; Congress did not intend to put either the Secretary or the courts in the business of evaluating jobs and determining what constituted a proper differential for unequal work. See 109 Cong.Reg. 9197–98, 9209 (1963); Hodgson v. Miller Brewing Co., 457 F.2d 221, 227 (7 Cir. 1972). The Secretary also has the burden of establishing a prima facie case that the wage differentials represent "discriminat[ion] . . . on the basis of sex." Shultz v. Wheaton Glass Co., 421 F.2d 259, 266 (3 Cir.), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). Once the Secretary has sustained these burdens, the employer can escape liability only by bringing itself within one of the four exceptions, the one that is particularly relevant here being the general escape clause, "a differential based on any other factor other than sex." On this the employer has the burden. Shultz v. Wheaton Glass Co., supra, 421 F.2d at 266; Shultz v. American Can Co., supra, 424 F.2d at 362.

Corning's most basic contention—one which, if sustained, would immediately end the case—is that work on a steady night shift is not performed under "working conditions" similar to work on day or afternoon shifts. To those uninitiated in the language of industrial relations, that would indeed seem to be true, and the District Court for the Middle District of Pennsylvania has so held, see note 7 supra. But, as said in one of Mr. Justice Frankfurter's early opinions, "[t]he recognized practices of an industry give life to the dead words of a statute dealing with it." United States v. Maher, 307 U.S. 148, 155, 59 S.Ct. 768, 771, 83 L.Ed. 1162 (1939). Statutory language addressed to experts must be read in the way the experts would understand it. See NLRB v. Highland Park Mfg. Co., 341 U.S. 322, 326–327, 71 S.Ct. 758, 95 L.Ed. 969 (1951) (Frankfurter, J., dissenting).

The legislative history of the Equal Pay Act supports the construction that the time at which work is performed was not regarded as a "working condition" but rather as a proper subject for "a differential based on any other factor other than sex." The equal pay bills, H.R. 3861, 88th Cong., 1st Sess. (1963); S. 910, 88th Cong., 1st Sess. (1963), as originally introduced in Congress, would have required equal pay for "equal work on jobs the performance of which requires equal skills." Ezra G. Hester, then Corning's Director of Industrial Relations Research, testified before both House and Senate Committees in opposition to this formulation. He pointed out that most of industry was by then using formal job evaluation systems in order to establish equitable wage structures in their plants, and that most of these job classification systems considered three factors in addition to "skill," to wit, effort, responsibility, and working conditions. As an example, he cited his own company's plan, which was introduced into the record. Under "working conditions" the plan and the accompanying job evaluation sheets listed two factors: "surroundings" (requiring evaluation of exposure to elements, intensity, and frequency) and "hazards" (requiring evaluation of frequency of exposure to hazard, frequency of injury, and seriousness of injury); nothing was said about time of day worked or differences in shift.[8] Mr. Hester testi-

---

8. Edward W. Noble, Corning's Manager of Job Evaluation, testifying in this case, gave a similar description of Corning's job evaluation plan and said specifically that

fied that "Other companies use similar job evaluation sheets," and urged the committees to amend the proposed legislation to conform to these industry practices. See Hearings on H.R. 3861 and Related Bills Before the Special Subcommittee on Labor of the House Committee on Education and Labor, 88th Cong., 1st Sess. 232–40 (1963); Hearings on S. 882 and S. 910 Before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 88th Cong., 1st Sess. 96–104 (1963).

In response to this, the bill was rewritten in committee and placed in its present form. Five House Committee members thus explained the change, H.R.Rep. No. 309, 88th Cong., 1st Sess. 8 (1963), U.S.Code Cong. & Admin.News, p. 690:

> The concept of equal pay for jobs demanding equal skill has been expanded to require equal effort, responsibility, and similar working conditions as well. These factors are the core of all job classification systems and the basis for legitimate differentials in pay.

Earlier in the Report, at p. 3, U.S.Code Cong. & Admin.News, p. 689, the Committee had indicated where it thought shift differentials would fit into the statute:

> Three specific exceptions and one broad general exception are also listed. . . . As it is impossible to list each and every exception, the broad general exclusion ["differentials based on any other factor other than sex"] has also been included. Thus, among other things, shift differentials, restrictions on or differences based on time of day worked, hours of work, lifting or moving heavy objects, differences based on ex-

perience, training, or ability would also be excluded.

This persuasive explanation of how the bill took shape, and the evident understanding of the Committee, consistent with this explanation, of the structure of the amended bill, outweigh the point, strongly pressed by Corning, that Representative Goodell, who introduced the bill and had a hand in redrafting it, remarked during the course of an explanation of its provisions that "hours of work, difference in shift . . . would logically fall within the working condition factor." 109 Cong.Rec. 9209 (1963). Corning also relies upon a statement by Representative Thompson, chairman of the Subcommittee:

> Thus, among other things, shift differentials, restrictions on or differences based on time of day worked, hours of work, lifting or moving heavy objects, differences based on experience, training, or ability would also be exempted under this act.

109 Cong.Rec. 9196. But this does not assist Corning; indeed, since it is apparent that Representative Thompson was only paraphrasing his Committee's Report, this rather supports the construction that time of day differentials were covered under the catch-all exception rather than by the term "working conditions."

Administrative interpretation by the Wage and Hour Administrator, which the Supreme Court has held entitled to deference, Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), further indicates that shift differentials are to be considered a legitimate exception to the Act rather than to reflect a difference in working conditions which would make the statute inapplicable. 29 C.F.R. §§ 800.100 *et seq.*

---

the time of day was not considered to be a "working condition." See also the Dictionary of Occupational Titles (3d ed. 1965), published by the Manpower Administration of the Department of Labor. Volume II: Occupational Classification, at 656, defines working conditions as "the physical surroundings of a worker in a

specific job," and gives the following examples: inside work v. outside work, exposure to heat, cold, wetness, humidity, noise, vibration, hazards (risk of bodily injury), fumes, odors, toxic conditions, dust and poor ventilation. It does not mention night work.

set out the Administrator's interpretations of each of the provisions of the Equal Pay Act and each of the terms used in the Act. Under "similar working conditions," § 800.132 says that "[g]enerally, employees performing jobs requiring equal skill, effort, and responsibility are likely to be performing them under similar working conditions," which in itself would seem to indicate that shift differences are not considered different working conditions since this is such a common situation. The only examples given of different working conditions are the salesman who works in a store as compared with the salesman who sells door to door, or one who does repair work in a shop as compared with one who does repair work in customers' homes. In contrast, the Administrator recognizes the legitimacy of night shift differentials in § 800.145, under "Exceptions to Equal Pay Standard."

Finally, while the case law is not conclusive, the decisions, other than the recent one between the same parties in the Middle District of Pennsylvania, see note 7 *supra*, are more favorable to the Secretary's position on this issue than to Corning's. See Shultz v. American Can Co., *supra*, 424 F.2d 356; Hodgson v. Miller Brewing Co., *supra*, 457 F.2d at 224–225 & n. 8; Wirtz v. Basic Inc., 256 F.Supp. 786 (D.Nev.1966).

Corning's impressive evidence that night work not only is less attractive than day work but often causes physical and emotional problems thus does not carry the day. While the statute indeed permits all this to be taken into account, it is relevant under the catch-all exception, with its requirement that the employer establish that the differential was based on a factor other than sex, rather than making night work a different "working condition" and eliminating application of the statute altogether. Thus the question is whether the higher

rate paid by Corning for night inspection work, until 1966 performed solely by males, was in fact intended as compensation for night work or constituted an added payment based in part upon sex.

■ A number of facts support the district court's conclusion that the latter was the situation here. As the history set out above indicates, the higher night rate was in large part the product of the generally higher wage level of male workers and the need to compensate them for performing what were regarded as demeaning tasks. The wage differential has never been regarded as compensation for night work. There was no evidence that any other night employees received higher pay than corresponding day workers until the plant-wide night differential was superimposed on the basic rates in 1944;[9] since that time, it is apparent that the shift differential has been thought to compensate, fairly and adequately, employees other than inspectors for night work. Indeed, Corning had separate male and female salary schedules until June 11, 1964.

The plain fact is that the differentials here at issue arose because men would not work at the low rates paid the women day-time inspectors to perform what the men called "female work." This is the very condition at which the Equal Pay Act was aimed. A higher rate paid to men for performing low-paid "female work" is not transformed into a permissible "differential based on any other factor other than sex" simply because the men work at night. We might, of course, have a different problem if New york had continued to prohibit the employment of women at night, but the prohibition had ended a decade before enactment of the Equal Pay Act, and there is nothing to indicate that Corning would have had any more difficulty in

9. The first night shift differential was only five cents per hour; the excess in the base rates paid the men working as inspectors on the night shift over that paid the women on the day shift was at that time on the order of fourteen cents per hour.

obtaining the Industrial Commissioner's approval in 1964 than it did in 1966.

■■ The only other basis advanced by Corning to challenge the district court's finding that it initially violated the Act is its contention that the day and night shift inspection jobs were not "equal work . . . the performance of which requires equal skill, effort, and responsibility" because some of the men on the night shift had to do their own "utility work," involving a certain amount of packing and lifting the inspected articles and cleaning up around the inspection station, which, on the day shifts, was primarily performed by male helpers especially hired for such work. It is now well settled, however, that the jobs under analysis need not be identical in every respect before the Equal Pay Act is applicable; inconsequential differences can be disregarded as long as the jobs are "substantially equal." Shultz v. Wheaton Glass Co., *supra*, 421 F.2d at 265; Shultz v. American Can Co., *supra*, 424 F.2d at 360; Hodgson v. Fairmont Supply Co., 454 F.2d 490, 493 (4 Cir. 1972). Applying this standard, the district court rejected Corning's contention primarily on the ground that Corning's job evaluation plan "considered the utility work of so little consequence that these tasks were not included in the job descriptions of any of the inspectors."[10] 319 F.Supp. at 1169. As the court below noted, *id.*, these job descriptions, prepared through observation of actual job performance in 1963 and 1964, are particularly significant here since they demonstrate Corning's own view of the content of the jobs before its perspective was changed by the filing of this litigation. Other evidence also showed the inconsequentiality of this factor. Although some male inspectors on the night shift had at times been given the assistance of utility workers, Corning has always continued to pay all night inspectors at the same wage. Indeed, Corning's Manager of Job Evaluation, Edward Noble, conceded that "there is very little difference from shift to shift" in the performance of these inspection jobs. There is ample support for the district court's conclusion that the relevant jobs entail "substantially equal" work. Cf. Shultz v. American Can Co., *supra*, 424 F.2d at 360–361.

■ We thus approve the district court's holding that when the Equal Pay Act took effect, Corning was violating it by paying higher base wages to the male night inspectors, and proceed to consider whether the violation has since been cured.

### III.

■ Corning first contends that it cured its violation by opening the night shift to women in 1966 on what was clearly more than a token basis, but see note 6 *supra*. Although this argument seems persuasive at first blush, it must be rejected. Congress was quite specific how the injustice of unequal pay for equal work must be eradicated. Recognizing the weaker bargaining position of many women and believing that discrimination in wage rates represented unfair employer exploitation of this source of cheap labor, see, *e. g.*, Hearings on H.R. 3861, *supra*, at 8 (statement of Secre-

10. Corning objects to the use made by the district court of the descriptions of the inspection jobs prepared for the Corning Glass Works Job Evaluation Plan (CGW Plan) and, to a lesser degree, of those contained in an earlier plan prepared for Corning by Stevenson, Jordan & Harrison (SJ&H Plan). Insofar as the objection rests on the hearsay rule, it is answered not only by the business records statute, 28 U.S.C. § 1732(a), but by the status of these plans as admissions (in the case of the SJ&H plan, an adoptive admission).

Insofar as the objection rests on the point that application of the Equal Pay Act hinges on actual job content rather than the employer's evaluation, see Hodgson v. Brookhaven Gen'l Hosp., *supra*, 436 F.2d at 724, the evaluation is nonetheless evidence, and often exceedingly good evidence, of the actuality; if either party seeks to show the contrary, it is open to him to do so. The job descriptions, together with the supporting testimony of Edward Noble, were sufficient to sustain the Secretary's burden of proof on job equality.

tary of Labor Wirtz), Congress declared that wage discrimination on the basis of sex "depresses wages and living standards" of the many families dependent on the income of women. Equal Pay Act § 2, 77 Stat. 56. Consequently it provided that an employer paying a wage differential violative of the Act should cure the violation by raising the wage rates of the women. This intention, clearly enough expressed in the proviso of 29 U.S.C. § 206(d)(1), that "an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee," received express emphasis from the legislators. "The only way a violation could be remedied under the bill . . . is for the lower wages to be raised to the higher." Hearings on H.R. 3861, *supra*, at 65 (statement of Representative Griffin); see also H.R. Rep. No. 309, *supra*, at 3 ("The lower wage rate must be increased to the level of the higher.")

In light of this apparent congressional understanding, we cannot hold that Corning, by allowing some—or even many—women to move into the higher paid night jobs, achieved full compliance with the Act. Corning's action still left the inspectors on the day shift—virtually all women—earning a lower base wage than the night shift inspectors because of a differential initially based on sex and still not justified by any other consideration; in effect, Corning was still taking advantage of the availability of female labor to fill its day shift at a differentially low wage rate not justified by any factor other than sex. We thus join with every other court of appeals which has considered the issue in holding that merely opening the higher paid jobs to women as vacancies arise is not sufficient to comply with the requirements of the Equal Pay Act. Shultz v. American Can Co., *supra*, 424 F.2d at 359; Hodgson v. Square D Co., 459 F.2d 805, 808–809 (6 Cir. 1972), cert. denied, 409 U.S. 967, 93 S.Ct. 293, 34 L.Ed.2d 232 (1972); see also Hodgson v. Miller Brewing Co., *supra*, 457 F. 2d at 226–227.

We come finally to Corning's contention that any violation was cured by the new collective bargaining agreement which became effective January 20, 1969. As previously indicated, this would clearly have been so if Corning had simply established a uniform day and night shift rate at least as high as the previous night shift rate, either with or without a plant-wide night differential. The problem stems from the "red circle" rate whereby any employee hired before January 20, 1969, receives a basic rate for night shift work some four to twelve cents per hour higher than for the day and afternoon shifts. Corning's contention that this is a differential based on seniority, another permitted exception, is belied by the fact that it is paid only for work on the night shift. We cannot disagree with the district judge, Hodgson v. Corning Glass Works, 330 F.Supp. 46, 50 (W.D.N.Y. 1971), that, on the facts of this case, "the 'red circle' rate paid to night shift inspectors perpetuates the discrimination of the 'supplemental escalating shift differential' "—the euphemism Corning has coined for the excess base wage rates paid to inspectors on the night shift.

We do not minimize the problems faced by Corning in changing policies originally resulting from New York law so that it will comply with the Equal Pay Act. It may well be that the wages originally paid the male inspectors on the steady night shift were more than the jobs were worth and were paid only because Corning could not get the men to do this work for less than they were receiving for labor requiring more skill or effort. With the benefit of hindsight, Corning could have avoided this suit—and its back pay liability—by opening the night shift to women once the New York law was changed in 1953, when there was no legal obstacle to reducing the night rate, or, perhaps more realistically in light of union pressures, holding the night rate and gradually in-

creasing the day rate until the two met, as was finally done, save for the "red circle" provision, in 1969. Even with the passage of the Act, however, Corning had ample time to restructure its wage rates to comply with the Act's provisions, for Congress postponed its effectiveness for one year, see Equal Pay Act § 4, 77 Stat. 57, in order to avoid the "severe hardship" immediate compliance might impose on employers. See S.Rep. No. 176, 88th Cong., 1st Sess. 5 (1963). But it did not do so, and upon the effectiveness of the Act, many of Corning's options were foreclosed by the proviso previously discussed. If the result here seems harsh in view of the efforts Corning has been making since 1966, the harshness is that which may be inevitable when a legislature demands a drastic change in discriminatory practices that had too long been accepted.

## IV.

Not content with requiring the payment of back wages which, with interest, will exceed $600,000,[11] the district court issued a sweeping injunction, broadly incorporating the words of the Act and applicable to all Corning plants (save that in Wellsboro, Pennsylvania), which we quote in the margin.[12]

We see no justification for this. Corning had been found to have violated the Equal Pay Act only with respect to one class of employee at its three plants in Corning, New York. As indicated, the violations were largely a result of the New York law which until 1953 had prohibited the employment of women at night. The Secretary's case was by no means impregnable, and Corning had been endeavoring since 1966—sincerely, if ineffectively—to bring itself into compliance. There was no evidence of widespread violations of the Act, either at the Corning plants or its 26 branch plants nationwide. The evidence rather was that the only other cases where a similar violation might exist were the inspection jobs in the plant at Wellsboro, Pennsylvania, which was excepted from the injunction because of a pending suit by the Secretary, and in a plant at Central Falls, Rhode Island, as to which the Secretary had also already instituted suit. Yet so broad an injunction put Corning under threat of contempt for any alleged violation of the Equal Pay Act in respect of any category of employee in all but one of Corning's many plants.

We agree with the point made by the Eighth Circuit, in another Equal Pay Act case, Hodgson v. American Can Co., 440 F.2d 916, 921 (1972), that absent a showing of a policy of discrimination which extends beyond the plants at issue here, there is no basis for a nationwide injunction. Moreover, the Supreme Court has held that

the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he should

11. Corning also challenges the district court's calculation of the amount of back pay due. We see no merit in this contention.

12. (1) The defendant shall not, contrary to section 6(d)(1) of the Act, discriminate on the basis of sex between employees employed within an establishment by paying wages to employees in such establishment at a rate less than the rate at which it pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions:

(2) The defendant shall not, contrary to section 6(d)(1) of the Act, reduce the wage rate of any employee in order to comply with the provisions of section 6(d)(1) of the Act:

(3) The defendant shall not, contrary to section 15(a)(1) of the Act, transport, offer for transportation, ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any of its employees has hereafter been employed in violation of section 6(d)(1) of the Act:

(4) Defendants shall cease to withhold any amounts owing to any employee which have been withheld in violation of section 6(d)(1) of the Act.

at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged.

NLRB v. Express Publishing Co., 312 U.S. 426, 435–436, 61 S.Ct. 693, 699, 85 L.Ed. 930 (1941). Since there is no showing here of the "proclivity for unlawful conduct" or "record of continuing and persistent violations of the Act" found to justify such an injunction in McComb v. Jacksonville Paper Co., 336 U.S. 187, 192, 69 S.Ct. 497, 500, 93 L.Ed. 599 (1949), the injunction must be narrowed accordingly. While Hodgson v. First Fed. Savings & Loan Ass'n, 455 F.2d 818, 825–827 (5 Cir. 1972), relied on by the Secretary, may have been correctly decided on its own facts, we cannot subscribe, in the light of *Express Publishing* and our own views, to all that was there said.

The injunction is modified by eliminating paragraph (3) and limiting the remaining paragraphs to inspectors at the three Corning plants. As so modified, the judgment is affirmed. No costs.

Pell, Circuit Judge, dissented and filed opinion.