## SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, Plaintiff,

v.

## WASHINGTON HOSPITAL, Defendant.

### Civ. A. No. 75–136.

United States District Court,
W. D. Pennsylvania.

June 21, 1979.

Kenneth L. Stein, Deputy Regional Sol., U. S. Dept. of Labor, Philadelphia, Pa., for plaintiff.

Paul P. Posa, Washington, Pa., for defendant.

## OPINION

ROSENBERG, District Judge.

This action was brought by the plaintiff, Secretary of Labor, United States Department of Labor, to enjoin the defendant, Washington Hospital, under § 17 of the Fair Labor Standards Act of 1938, as amended 29 U.S.C. § 201 et seq. (Act) from violating the equal and recordkeeping pursuant to the provisions of § 206(d)(1),[1]

---

1. "(d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between em-

§ 211(c) and § 215(a)(2), (5)[2] of the Act, and further to restrain the defendant from withholding back wages resulting from any illegal pay differentials found to have existed in the past or existing at the present time, and to further compensate those who may have been damaged for the past years.

The action centers upon the issue of differentiation which, the plaintiff alleges, is being made by the defendant between nurses aides denominated Group 2 and orderlies identified as Group 3 as reflected in their respective rates of pay.

While the complaint as filed charged violations of the minimum wages provisions under § 6 of the Act (§ 206, the plaintiff abandoned a claim relating to full-time student employment. The defendant also abandoned and withdrew the asserted defense of laches. On the pleadings as filed by the parties, and after considerable discovery procedures and arguments in connection therewith, the matter came for trial and was heard before me without a jury over a period of approximately twelve days.

The questions which must be decided here under the law and the facts of the case are (1) Did or are the Group 2 nurses aides and Group 3 orderlies, as employed by the defendant, entrusted with duties which are substantially equal? (2) Were or are the instructions and training given to each of the two groups, that is Group 2 nurses aides and Group 3 orderlies, equal? (3) Did the completely instructed and trained employees in Group 2 and Group 3, in the performance of their duties for the defendant, possess equal skill, effort and responsibility? (4) Did the defendant pay or is the defendant paying different wages to the Group 2 employees from the Group 3 employees because of sex?

In arriving at legal conclusions to these questions, it will not matter that the duties of both groups are not identical or even similar, since it may be that each group may or does have dissimilar duties. *Usery v. Allegheny County Institution District,* 544 F.2d 148, C.A. 3, 1976, cert. den. 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977). What will matter is that in order for the plaintiff to prevail, I must find that the job content as well as the skill, effort and responsibility and working conditions are equal. *Angelo v. Bacharach Instrument Co.,* 555 F.2d 1164, C.A. 3, 1977. In *Angelo,* Judge Rosenn said (at page 1174):

"The courts have given effect to these manifestations of congressional intent, and have indicated that the concept of equality under the Act embraces job content as well as skill, effort, responsibility, and working conditions. In *Brennan v. City Stores,* 479 F.2d 235 (5th Cir. 1973), for example, the Fifth Circuit noted that '[w]hen Congress enacted the Equal Pay Act, it substituted the word "equal" for "comparable" to show that "the *jobs* involved should be virtually identical, that is, they would be very much alike or closely related to each other." The restrictions in the Act were meant "to apply only to *jobs* that are substantially identical or equal".'" Id. at 238 (Emphasis added) (remarks of Rep. Goodell).

This case contains 1686 pages of transcribed testimony and 57 exhibits as presented by both parties. The evidence as presented was neither orderly nor chronological, and was at times so disarranged as to tend to confuse times, places and circumstances and by argument to precipitate erroneous conclusions. Also the problem of credibility was made more difficult by the considerable inconsistencies and contradictions (some within witnesses' own testimony—much I am sure unintentional) which I was required to reconcile if I possibly could

ployees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) seniority system; (ii) a merit system; (iii) a system which measures earning by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . ."

2. These sections are not pertinent here.

do so. Accordingly, I was required to do, and did much rereading, comparing and contrasting of the evidence in order to clarify the facts as they became credible by the preponderance of the evidence as a whole.

The defendant is a non-profit Pennsylvania corporation engaged in operating a general hospital in Washington, Pennsylvania. It accepts and treats patients in all categories of illness. It operates in three buildings: the main hospital building, a seven-story structure with several wings containing 544 beds and 44 bassinets. It is administered and operated by 1340 employees.

Prior to February 1, 1970, the defendant, Washington Hospital, had no Extended Care Facility. On that date, the Hospital purchased Washington Manor which was an investor-owned rest home or facility. As of that date the defendant hospital assimilated Washington Manor as a part of its own institution as a public general hospital, and that included the building, appurtenances and the employees at the then existing wage scale of the hospital. Thereafter it converted the nursing home institution into what is now a part of the defendant Washington Hospital and referred to as the Extended Care Facility (ECF). This facility consists of a three-story building of 92 beds, and is now used primarily for patients who no longer require hospital care but remain there until they are ready to go home.

The functional processes of conducting the general hospital is a more or less complex but systematically managed business organization headed by corporate officials. As relates to the medical functioning of the hospital, responsibility at the top is with medical doctors. A nursing procedural committee includes the head and staff nurses, supervisors, technicians, orderlies, nurses aides and secretaries who make changes when improvements in conditions, medicines and patient care and the like are required. Ancillary committees also work with them. However, it is the staff doctors who approve the procedural committee's actions. Thus it is that management of the medical administration of the hospital is in the hands of professionals and those who

have acquired expertise under the overall supervision of the professionals. At the top of the list are the doctors. Then come the registered nurses and some practical nurses. After these the operatives are the technicians, followed by the orderlies, who are in effect special assistants to the doctors. These are followed by the nurses aides.

For our purposes here we accept the qualifications and virtues of both the doctors, the registered and practical nurses and the technicians. Our inquiry relates to the similarities and differentials of the qualifications and virtues of the orderlies and the nurses aides. We observe first of all that the hospital retains 25–27 orderlies and 195–205 nurses aides. The enlistment, interviewing, consultations and eventual selection of orderlies and nurses aides, together with secretaries, is subject to the approval of certain committees and Mrs. Alice Jane Roche, Ancillary Supervisor. Mrs. Alice Jane Roche has been employed by Washington Hospital since 1957 as a registered nurse or supervisor. Since 1970, she has held the position of Ancillary Supervisor, whose duties are to interview and hire aides, orderlies and secretaries for the Department of Nursing. She also confers with the instructors, helps relieve other supervisors on their days off throughout the hospital and is concerned with the training manuals. In addition, she schedules and assigns aides and secretaries and helps James Hargrove in his weekly scheduling of the orderlies.

The instruction and training of the orderlies takes place under James Hargrove, Chief Orderly for the past fourteen years, and an employee of the hospital for twenty-nine years, and of Dr. John Pirris, the Urologist and Chief of Surgery, and Dr. Glenn D. Hisrich, Orthopedic Surgeon, and Dr. D. T. Corwin, Orthopedic Surgeon, and additionally two registered nurses. These inculcate in the orderlies certain specialized skills, which otherwise would be required to be done either by the registered nurses or the doctors, themselves.

Knowledge and training is instilled in the first instance by a two-week period of classroom training and instruction, and thereaft-

er to assignments in various units of the hospital under either the direct supervision of Hargrove and other orderlies or Dr. Pirris and Dr. Hisrich. They are on probation for a period of the first two months and evaluated at the end of the first month, and as well at the end of the second month. They do not perform independently until they have been in training for at least six months and have been checked out on all procedures, which check-out period ordinarily runs for six months. The six-month period begins from the date they go into training. After they are checked out, they are required to perform independently.

3. These skills are not taught to nurses aides.

4. Cystoscopy—Direct visual examination of the urinary tract by means of an endoscope, an instrument for examining the interior of a hollow organ, as of the rectum, the urethra and the bladder. Dorlands Illustrated Medical Dictionary, 23rd Edition, page 348; Webster's New Collegiate Dictionary, 1960, page 272.

Nurses and operating room technicians (on a higher level than Group 3 orderlies) assist the urologist with female examinations. Group 3 orderlies either assist the urologist, or in the case of an emergency, perform cystoscopies in approximately 60 to 70 percent of the male patients. Cystoscopy is done in the cystoscopy room, attached to the surgery room. Orderlies sometimes must administer a local anesthetic by inserting Xylocaine into the patients' bladder and applying a special clamp to retain the solution in the urethra and bladder. Catheterization is applied when necessary. The assistant positions the patient on the cystoscopy table and prepares the patient with a sterile solution. If the patient is not prepared properly, the patient can become contaminated. On the various floors and in the out-patient clinic, the orderlies, in treating male patients prepare the patient without the doctor's supervision. The work in the cystoscopy room requires a completely sterile procedure and requires an orderly be available constantly from 4 to 5 hours. Although cystoscopic work is done mostly on the 7 a. m. to 3 p. m. shift, it is done sometimes on an emergency basis on other shifts and every orderly is required to know the procedure in order to be able to carry it out independently without supervision when the urologist is not present. Every orderly in the hospital does this kind of work.

5. Catheterization—The withdrawal of fluids by means of a tubular surgical instrument of fluids from a cavity of the body, especially one for introduction into the bladder through the urethra for the withdrawal of urine. Dorlands Illus-

The highest skills which are taught the orderlies [3] and in which the orderlies are required to achieve the topmost expert training are procedures in the cystoscopy [4] room, catheterization,[5] bladder decompression,[6] and surgical preparation (surgical prep).[7] Both cystoscopy and catheterization are learned under the supervision of the urologist and the chief orderly, Hargrove. While they learn to construct, maintain and adjust the various kinds of traction devices under the direction of Hargrove, such activities with the patient are under the inspection and approval of the orthopedist,[8] who himself, places the patient into the device.

trated Medical Dictionary, 23rd Edition, page 241.

Catheterization is done by the orderlies only on male patients, but catheterization on female patients is performed by the physician or the registered nurse. Several types of catheters are applied such as the suprapubic tubes which are placed into the bladder through the abdominal wall. The Foley catheter or in-dwelling catheter having a balloon at one end is inserted into the bladder through the urethra. The straight and curved catheter is placed in the bladder also through the urethra. Dr. Pirris classified the practice of catheterization as one involving many dangers to the patient to the point that "this can kill people". Catheterization is not just a single operation of inserting a catheter but involves the other processes of "in-dwelling catheter", the changing of catheters and irrigating catheters.

6. Bladder decompression is similar to catheterization and is necessary when a patient has a distended bladder due to urinary infection. It involves inserting the catheter to drain the bladder during a period of 12 to 24 hours. Orderlies do 99% of the bladder decompressions. Aides do not do it.

7. Surgical preparation is performed to render the operative site on a patient's body sterile and to prevent the danger of infection in order to avoid contamination of a patient who might otherwise develop chills and fever. Orderlies and higher paid operating room technicians provide such treatment for males and nurses provide this treatment for females. It takes a minimum of one week to acquire the necessary skill to perform surgical preparation. It is ordinarily performed in the afternoon before surgery but in cases of emergency, it is done at that time.

8. Traction. Traction devices are set up only under the orders of physicians, although ad-

The orthopedist is also responsible for and supervises their teaching, instruction, training and eventual functioning of bivalving or removing casts.[9] Orderlies crack oxygen tanks with full knowledge of what must be done and of the dangers involved in handling the oxygen, under the supervision of the inhalation therapists. While requiring a less amount of skill, Group 3 orderlies are required also to scrub for isolation for the purpose of cleaning up the linen and garbage outside the room.

While at Washington Hospital, cystoscopies, catheterizations and surgical preparations may be done by registered nurses on both males and females, these functions are ordinarily performed by registered nurses or technicians on females and on males by the orderlies. Group 3 orderlies are required to expend 75 to 80 percent of their time doing these various skilled procedures.

Additionally, the orderlies may provide special care or treatment to male patients as they are assigned to nursing units. They are given the responsibility for patients in all areas of the hospital. These consist of taking rectal temperatures on male patients, cleansing patients and assisting the registered nurses. While these specialized functions require that the orderly or registered nurse, who would have to do it otherwise, are invested by instruction and training with the skills for performing these specialties, orderlies are at times required to perform some few duties as are performed by nurses aides.

In providing special care or treatment to male patients as they are assigned to nursing units, the orderlies are given responsibility for 60 to 200 patients in the overall areas of the hospital. They are also required to perform the less glorified function of mopping floors in the emergency room and operating room as necessary.

The hospital employs a number of male and female orderlies and classed in Group 2, whose sole function is to transport patients to and from the X-ray and physical therapy departments and who, because of their limited function, are not directly a part of this case.

As presently set up, next in line for the necessary operation of the hospital is the less glamorous group designated as the Group 2 nurses aides. These are those who are in reality what the name signifies— aides to nurses. At Washington Hospital they are taught limited skills by and under the immediate direction and supervision of registered nurses. These consist of the basic procedures of giving baths, making beds, taking temperatures, pulses and respirations, cleaning patients' rooms after discharge. They do not catheterize patients but are shown films and demonstrations to give them some idea of what is happening to a patient. They are taught for two weeks in a classroom and two weeks on the hospital floor.[10] After that they are as-

justments of such devices are sometimes requested by a nurse. The orderly has been trained and skilled in the various techniques required for this function in setting up a variety of devices such as head frames, Russell traction, balanced skeletal traction, Bucks traction and cervical traction. These consist of heavy frames to which a pulley is attached set on the footboard of a bed, to the more complicated balanced skeletal traction over the bed with its even more complicated structural parts. Unless the operator installs such a device appropriately with the necessary finesse or skill required and properly adjusts it, it can provide dangers which may harm the patient.

**9.** Bivalving and removal of casts. Bivalving and removal of orthopedic casts may occur from a small number in a week to a large number in one day. They are removed only in the orthopedic department and the out-patient clinic by orderlies. The operation involves the use of a vibrating saw which has a circular blade capable of scraping or cutting the patient if not used properly. This operation also includes not only the cutting of the cast but the removal and cleaning off of the gauze which may be sticking to the skin so that the site may be examined by the physician. It requires that the operator be able to assure the patient that the procedure is safe and that in the removal of the cast, the operator is concerned with the patient's safety, and also of his own competence as the operator.

**10.** Nurses aides, as with the case of all hospital personnel, are on sixty days probation in accordance with the Union contract, Article III, Section 3.4.

signed to a nursing unit under the guidance of the head nurse of that unit.

While all nurses aides are given general information relating to hospital functioning in the treatment of ailing persons, they are not taught the skills which are taught the orderlies, nor given specific training by special teachers over a period of not less than six months until approved and checked out.

On occasion during their service, they will be tendered the opportunity to attend lectures or conferences relating to medically oriented practices by operatives in the hospital. These, however, are not required nor do all aides participate.

Nurses aides perform simple nursing procedures which do not require the necessary skill of the doctor, the registered nurse or the orderly. They may give enemas, assist patients in bathing procedures, remove soiled bed linen, take temperatures, pulses and respiration, maintain cleanliness of utility areas and perform other duties as assigned by authorized personnel. They are required to be ready to apply cardiopulmonary resuscitation if a patient could have a heart attack.[11] In main part, however, nurses aides are charged with the duty of more menial functions, such as keeping beds and wheelchairs clean, procuring and distributing clean linen, passing trays and water, delivering food and beverages, doing body rubs, and the like. Also unlike orderlies who are entrusted with independent week-long, overall hospital assignments, nurses aides receive daily specific assignments confined to the floor area under the direction and supervision of the head nurse on the floor.

Next in line for operative hospital functions, since no evidence was presented in that connection, except references here and there throughout the hearing of the case, we may basically speculate that there are technicians, those performing janitorial, laundry, building maintenance, repair, landscaping and other such functions. But since we are not concerned with any of these, they are mentioned only for the purpose of showing the employee structure of the hospital and their functions, with the possibility that these may throw light on the classes and characters of employees, as all of these may present comparisons or contrasts between nurses aides and orderlies.

Into the category of operatives, I fit the name of Alice Jane Roche, Ancillary Supervisor. She is involved in a series of complex duties of selecting, interrogating, hiring and indirect supervising of nurses aides, as well as supervising the operatives generally. Similar to Mrs. Roche, as an operative of the hospital, is James Hargrove. He is the head orderly, and as I said before, with Dr. Pirris, not only inculcates certain urological[12] knowledge in the orderlies, and orthopedic[13] knowledge with Dr. Glenn D. Hisrich and Dr. D. T. Corwin, but he applies the necessary training and experience skills over a period of six months or more so as to provide this class of operatives with the medical skills necessary in the performance of their specialized functions in aiding the doctors, or partially substituting in the case of males for registered nurses.

Maureen Kane is the Director of Nursing at the Washington Hospital and has been since May 11, 1971. Mrs. Kane is responsible for the School of Nursing as well as for Nursing Service. She is familiar with the functions of the nurses aides and the orderlies. She has authority to send personnel outside of the hospital to seminars for gen-

---

11. Cardiopulmonary resuscitation at Washington Hospital is taught almost automatically to all personnel, nurses, nurses aides, orderlies, etc. Through the Heart Association of Western Pennsylvania lay people everywhere are learning to perform this vital function in case of an emergency anywhere, as is now practiced in our District Court for the Western District of Pennsylvania with our court personnel, as well as our judges.

12. Urological—medical science relating to urine or urinary organs. Webster's New Collegiate Dictionary, page 936.

13. Orthopedic—relating to or employed in orthopedics; involving or affected by deformities or crippling conditions. Webster's Third New International Dictionary, Unabridged, page 1594.

eral refresher information. She testified that orderlies are given orthopedic and cystoscopy in-service programs. These are required of orderlies, although nurses aides are not excluded if they wish to attend, nor would any other personnel be excluded. It is, as Mrs. Kane said, ". . . because the more knowledgeable our personnel is (sic) the easier it is for them to work with patients". However, no authority or directions have ever been given to nurses aides at Washington Hospital to perform these specialties. And when on occasion a nurses aid did venture into this field, she was told, as in the case of Frances Gatling who catheterized only once "to get the idea", that that was the nurse's duty.[14]

The Congressional purpose to equalize pay between male and female employees in equal categories with equal skills and equal responsibilities is judicially obligatory. But Congress never indicated, nor intended, that employment skills and responsibilities be leveled between males and females for the sake of equalizing their pays.

The plaintiff strives to build a case of inequality against the defendant in its hiring practices of nurses aides and orderlies on the allegations that they have equality of skill, effort, responsibility and working conditions with tinges of testimony in the case to produce an element of sex prejudice in the hiring, training and retention of these two classes.

Prior to the acquisition by Washington Hospital in 1970, the separate independent Extended Care Facility had been known as Washington Manor and was mostly a nursing home for the elderly. It retained only registered nurses and nurses aides, but in the 1960's it suffered a shortage of registered nurses and sought help to fill the gap. It then reduced the registered nurses requirements to two years and created a new class of thirty of their nurses aides whom they entitled "Advanced Nurses Aides" and gave them a $10.00 raise. It then attempted to have the registered nurses on duty

give them additional knowledge and training over a two-week period. It thus began to press the advanced nurses aides into more critical functions which up to then were done exclusively by the professional registered nurses. The nurses aides were created on a short order basis and shown, among the registered nurses functions, catheterization but not under the doctor's supervision. So these advanced nurses aides performed some services of registered nurses, but not as substitutes for the doctor's functions as in the case of the orderlies who functioned as aides to the doctors at Washington Hospital.

The program was abolished sometime in 1969 or 1970 but the pay of the advanced nurses aides was not reduced. When Manor Hospital was taken over by Washington Hospital in 1970, the advanced nurses aides who continued to do some of these functions which they had done at Washington Manor were instructed that they would no longer be permitted to perform any special duties to aid the nurses, which were the functions of the registered nurses and orderlies. However, several continued on occasion to perform without authority at Washington Hospital, but this was done only on a few occasions and by only a few of the former advanced nurses aides.

What the plaintiff is attempting to do now is (1) to compare Manor Hospital permissibilities, prior to 1969–1970, with Washington Hospital's functioning after it took over Manor Hospital in 1970; (2) to compare "advanced nurses aides" at Manor Hospital prior to its takeover by Washington Hospital in 1970 with the Washington Hospital orderlies; (3) to project the 1960's Manor Hospital inadequately trained advanced nurses aides' functions into an equality with the critical performance and results produced by the expertly trained orderlies at Washington Hospital, after its takeover of Manor Hospital in 1970; and (4) to impute functions, skills, efforts and responsibilities of 195–205 nurses aides in

14. This seems to have occurred at Manor Hospital because she became an advanced aide in 1967 at Manor Hospital.

Washington Hospital with the uncorroborated self-professed claims of skills and accomplishments of a few advanced nurses aides at Manor Hospital in the 1960's.

Because of the registered nurse shortage, Manor Hospital attempted in the 1960's to create a supply of amateur registered nurses speedily by sidestepping the Pennsylvania Statute known as "The Pennsylvania Nursing Law", 63 Purdon's § 211 et seq.[15] The statute in § 216 provides, amongst other things, that before one may be licensed as a professional or registered nurse, as titled by law he or she "has graduated from a school of nursing which gives at least a two years' course of instruction, or has received instruction in different schools of nursing and in other approved agencies with which such . . . two years' course of instruction and has then graduated . . . The course of instruction shall include, (1) principle of nursing based on biological, physical and social sciences; (2) responsible supervision of patient involving skill in observation of symptoms and reactions and the accurate recording of the facts and carrying out of treatments and medication prescribed by a licensed physician; and (3) the application of such nursing procedures as involve understanding of cause and effect in order to safeguard life and health of a patient and others."

Additionally, such registered nurses after passing the necessary examinations must biennially reapply for automatic renewal after paying a fee to the Commonwealth of Pennsylvania. The statute does not prohibit "auxiliary services rendered by persons carrying out duties necessary for the support of nursing service, including those duties which involve minor nursing services for patients, performed in hospitals or elsewhere under the direction of licensed physicians or supervision of licensed registered nurses."[16]

In providing superficial nurses as substitutes for the unobtainable, genuine, registered nurses, Manor Hospital, for whatever reasons is not apparent, did not resort to the lesser required authentic, competent, practical nurses which the Legislature of Pennsylvania permitted under the "Practical Nurse Law" of March 2, 1956, P.L. 1211, 63 Purdon's § 651 et seq. Here, too, this statute provided necessarily basic training after preliminary foundational education of a completed course in practical nursing, "prescribed and approved by the board in a school, hospital or other institution, of not less than [1500] hours and within a period of not less than [12] months." § 655.

Here, also, in spite of the competence practical nurses are required to attain, the law nevertheless specifies that "the 'practice of practical nursing' means the performance of selected nursing acts in the care of the ill, injured or infirm under the direction of a licensed professional nurse, a licensed physician or a licensed dentist which do not require the specialized skill, judgment and knowledge required in professional nursing." § 652.

While the evidence indicated that there was a shortage of registered nurses at Washington Manor, there was not the slightest element of evidence as to why Manor Hospital could not have gotten practical nurses in spite of the fact that one of those whom they termed as an advanced nurses aide stated that she was a practical nurse, without authentication of that fact. But what is critically obvious is that the least possible training for licensed practical nurses amounted to approximately six months of eight hour days within a period of not less than twelve months. The advanced nurses aides at Washington Manor became authenticated unlicensed practitioners with two weeks of instruction by a

**15.** This statute was in effect at the time that Manor Hospital existed before 1970. Since then the Pennsylvania Legislature reenacted a new statute with considerable differences by the Act of July 3, 1974, P.L. 432, Purdon's Supp. § 197 et seq. Thus my references here are to the statute which was in effect as of the relevant times prior to 1969–1970.

**16.** I assume that this includes the right of hospitals to train technicians, orderlies and nurses aides as at Washington Hospital.

registered nurse.[17] What is more unimpressive to me is that these few advanced aides at Washington Manor verified their own competences by self acclaim. And what is more distracting is that not one single bit of evidence was offered by the plaintiff through any doctor, registered nurse or other competent expert, in or out of the hospital, that these two-week trained and self-acclaimed advanced aides were truly proficient in performing the critical functions such as catheterizations.

While I must concern myself directly with the job contents of orderlies and nurses aides, I must distinguish, if a distinction there be, between the reason and purpose of content difference, if such there be. It is within the exclusively medical corridor where the answers to these should be found. Here are a wide variety of differentiated skills which Pennsylvania law has seen fit to recognize and distinguish.

Besides registered nurses and practical nurses, there is the wide variety of specially skilled, basically trained physicians, and as well those who are not physicians. These are optometrists,[18] with superficial knowledge of eye deficiencies; podiatrists [19] with superficial knowledge of foot care, and midwives [20] with narrow knowledge of infant deliveries as a substitute for a doctor, or a specialist such as a gynecologist or obstetrician.

It is evident that these lesser skills of limited or specially oriented phases of medical applications to the needs of human beings in the treatment of their ailments, injuries or infirmities, require substantially minimum instructions and training before they are permitted to even apply for licenses to practice on human beings. It is obvious that none of these would be permitted to do so after only two weeks of limited instructions such as that boasted—without any verification or corroboration whatsoever—by the ten or twelve Manor Hospital advanced aides of the 1960's offered as foundational testimony in this case.

To summarize, the plaintiff has presented a number of advanced aides who were employed at Washington Manor. In total, their evidence is that all the treatment which was applied to the elderly people at the then-existing nursing home, known as Washington Manor was after only a two-week course "when her teacher used to teach", or what she learned from "in-service" movie courses, or when a nurse directed her to perform a catheterization on one occasion, or after a two-week training course performed catheterization and surgical preps.[21] Other advanced aides admitted that they did not catheterize or provide surgical preps, or been taught catheterization by registered nurses, or had never done any catheterization at Washington Hospital. One advanced aide at Washington Manor had done catheterization on male and female patients after she had been shown how to do it at one time, and that from then on she "was on her own" and had received "in-service" courses by seeing a movie on catheterization.

Other evidence presented by the plaintiff through nurses aides and orderlies presented no support for the plaintiff's claims, or completely contradicted those witnesses who were advanced aides, such as that of the testimony of a nurses aide who said she only catheterized once "to get the idea" but was told not to do so because it was the nurse's duty, or another who testified she did no catheterization, or another who testified that she was an advanced aide in 1970–1975, in spite of the testimony that advanced aides were eliminated in 1969–1970. All admitted that only orderlies work in the cystoscopy room.

It is not necessary that I detail each of the advanced nurses aides who functioned

---

17. Transcript page 371.

18. 63 Purdon's Supp. 231 et seq.

19. 63 Purdon's Supp. 421 et seq.

20. 49 Pa.Code, 17.121 et seq.

21. Dr. Pirris, the urologist, testified that catheterization training is "complex and lengthy" and presents "many great advanced dangers, and catheterization usually requires one month, while surgical preps take about one week."

at Washington Manor and as they attempted occasionally to function after Washington Hospital took over the extended care nursing facilities. While these advanced aides' functions consisted of some catheterization at Washington Manor, it did not relate to the overall skills and responsibilities which were practiced by nurses in the case of females and orderlies in the case of males at Washington Hospital. The training extended to a nurses aide definitely did not include cystoscopy, preparation for surgery, removal of casts and setting up tractions. There is a disparity in the testimony of the advanced nurses aides who testified in this regard. Some said they applied their skills both to male and female patients. Some said they only did it occasionally. One said that she did it just to see if she could do it. In any event the operations that one or two of these nurses aides performed were on a voluntary basis rather than by direction.

All of this activity at Manor Hospital is in contrast to the regular functioning of Washington Hospital and its operational staff, with the professional classified skills emanating down from the doctors to the nurses, to orderlies and eventually to nurses aides, with constant supervision of nurses aides by the supervising head nurses on the various floors, and in the case of the orderlies, through the urologist, orthopedist and the head orderly and others.

The testimony of these several advanced nurses aides as witnesses contains many variables and statements which in many instances dispute the statements made by others. Thus, the plaintiff has not presented either a plain or convincing picture in support of his contention that Group 2 nurses aides had acquired and were practicing the skills, efforts, and responsibilities of the Group 3 orderlies, under equal working conditions.

The application and utilization of a bona fide substantial program of a training course by competent teachers in inculcating special medical capabilities and competence in the skills required in the performance of certain hospital job functions is significant, and must be recognized judicially as it may or may not reveal the bona fide training of technical medical skills critical to the well-being of patients in a hospital. *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, C.A. 5, 1978, cert. den. 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55.

The evidence is uncontradicted here that orderlies receive instructions and applied practical training from the hospital supervising urologist, the long-experienced and well-versed technical trainer of orderlies, the medical experts teaching surgical preparations and the orthopedic doctors teaching cast removals and applications of various kinds of traction devices, as well as from other teachers. No nurses aides ever received this kind of instruction and training at Washington Manor, nor do any now receive or ever heretofore have received instructions and training. Repeating here, less than a dozen of the two hundred nurses aides who attempted or did on occasion perform some of the functions of the orderlies or professional nurses did so without any showing of skilled instructions or training on what seems to have been mostly by the self-acquired method. It is possible, nevertheless, that on occasion an individual may be so superlatively capable and competent that he or she may acquire skills by the self-teaching methods, but if so, such practices have no place in a hospital where human beings' lives, safety and welfare are too precious to be permitted to be placed in jeopardy at the hands of more or less self-taught amateurs, or those who are venturesome and irresponsible.

The fact that Manor Hospital allowed such practices in the 1960's, in itself, does not provide a foundational standard of acceptable competences. Even the recognition by an employer of an employee's greater competence or ability to learn or to adapt more easily than another employee and the subjective evaluation of the employer of such circumstances of employees does not take the place of bona fide training programs. *Marshall, Secretary of Labor, United States Department of Labor v. Security Bank and Trust Co.*, 572 F.2d 276, C.A. 10, 1978.

All of the duties testified to by the advanced aides at Washington Manor, I find that not a single one of these had performed all of the functions which orderlies had been trained to do at Washington Hospital, or any one of the functions continuously or over any extended period. For instance, one or two nurses aides catheterized occasionally, one removed two casts but did no catheterization or surgical preparation, one did catheterization on one male, but was told not to do it because it was the nurse's duty. This must, of course, be considered as of 1970. Nurses aides did not, and were never authorized to, perform catheterizations at Washington Hospital, or remove casts or do surgical preps. Incidental or occasional performance of a task does not classify it as one of content. *Wirtz v. Rainbo Baking Co. of Lexington*, 303 F.Supp. 1049 (D.C.Ky.1967).

After consideration of all of the evidence in the case, as a whole, and observing the plaintiff's witnesses who testified as to their capability in performing these occasional functions here entrusted to nurses and to orderlies, I was unimpressed by their credibility and concluded that their testimony was being colored by the possibility of receiving damages if the plaintiff prevailed. I was further impressed by the fact that so many other witnesses in the case, including some old-time nurses aides, either contradicted the testimony of these few formerly advanced aides, or provided circumstances which disputed their testimony in one or more instances.

The $10.00 raise in pay for advanced nurses aides at Manor Hospital was continued by the defendant after 1970, until in 1974 the hospital employees by a collective bargaining agreement entered into with their union, National Union of Hospital and Health Care Employees Division of RWDSU, AFL-CIO and District 1199P that fixed the grades and pay scales of these and other membership employees. However, the fixing of levels and classes of employees and wage scales in the union bargaining agreement is not controlling here. *Shultz v. Wheaton Glass Company*, 421 F.2d 259, C.A. 3, 1970. We are here concerned with two levels of employees, only, in the issue as raised by the parties, the nurses aides (Group 2) and the orderlies (Group 3), their similarities, differences, qualifications, knowledge, skills, competences, medical trustworthiness and performance efficaciousnesses, if any. The comparability of jobs is insufficient to give rise to the inference that jobs are "equal". *Angelo v. Bacharach Insurance Co., supra.* Substantial likenesses and differences must be examined totally from all the evidence in the case as a whole. Therefore, the question to be resolved, as I already stated, is whether or not jobs involve equal work performance of which requires equal skill, effort and responsibility and under similar working conditions. *Tuma v. American Can Co.*, 373 F.Supp. 218 (D.C.N.J.1974). Employees perform "equal work" when it is necessary to expend the same degree of skill, effort and responsibility in order to perform substantially equal duties which they do in fact routinely perform with the knowledge and acquiescence of the employer. *Katz v. School District of Clayton*, 557 F.2d 153, C.A. 3, 1977.

The burden is on the Secretary to prove by a preponderance of the evidence that the nurses aides at Washington Hospital perform equal work on their jobs, which requires equal skills, effort and responsibilities with that of the orderlies, and under similar working conditions. *Hodgson v. Corning Glass Works*, 474 F.2d 226, C.A. 2, 1973.

A credible explanation of what nurses aides are not taught and the skills which they do not possess in contradistinction to the many skills which are taught, possessed and practiced by orderlies has been set forth in the testimony. In making determinations of the questions originally posed and of the requirement that for the plaintiff to prevail, I must find that the job content as well as the skill, effort, responsibility and working conditions of the two groups are equal. In this regard, I am well guided by the principles laid down by our Circuit in two cases, with significant supports from other Circuits, which so pointed-

ly accommodate the facts of the instant case. They are *Usery v. Allegheny County Institution District, supra* and *Angelo v. Bacharach, supra.*

In *Usery v. Allegheny County et al., supra,* these questions in substance were raised and answered. The question was raised as to why female beauticians were not paid equally with barbers. Judge Gibbons, speaking for the Court of Appeals, stated that the evidence in the case showed similarity between both groups of employees, as beauticians and barbers engaging in activities for "hair care for geriatric patients". It was found that while Pennsylvania law required each to receive separate professional licensing the work performed by the two professionals at Kane [hospital] was "substantially similar", and that even under Pennsylvania law, persons of either sex might serve members of either sex. In fact, Judge Gibbons (544 F.2d, page 154), said,

"We have concluded above that beautician and barber work at the hospital is substantially equal. And to the extent that there is a difference, *the higher skill is employed by the lower paid group.*" (Emphasis added).

These findings were supported in the opinion by the facts that the training, the familiarizing of hair cutting and the accompanying treatments therefor and the use of electrical appliances were skills acquired by both barbers and beauticians, except that beauticians studied additionally such cosmetic skills as "permanent waving, rinses, hair tinting and bleaches, wigs and hair pieces, manicuring and makeup . . ." (*Supra*, at page 153). This it would seem was the basis for Judge Gibbons' statement that "the higher skill is employed by the lower paid group".

In accordance, then, with Judge Gibbons foundational findings of identical or equal work between the two groups, I am directed to the many differences which exist in the instant case between the training, skills, efforts and responsibilities between the orderlies and nurses aides at Washington Hospital. I am reminded by Judge Gibbons in

*Usery, supra,* at page 153, that "Training and education are elements of skill for the purposes of the Act, 29 C.F.R. § 800.125 (1974)."

In that connection, since elements such as those which exist here, I am obligated to inquire into the character, quality and the eventual responsibility which such training and education as applied to either nurses aides or orderlies has had, and may have any effect, upon the functioning of either or both in the performance of their duties. Particularly, I should inquire into the character and quality of any specialized training and instruction which is vital to human welfare.

In *Angelo, supra,* equal pay was demanded for lower paid female positions who claimed that they did equal bench work in a heavy assembly department, particularly when some of the work of the higher paid male positions had been transferred to them. Here the Court of Appeals affirmed the directed verdict for the defendant of the late Judge Herbert P. Sorg, because of insufficient evidence by the plaintiff.

In the present case the advanced nurses aides' claim of doing equal work to that of the orderlies—although they did not lay claim to functioning in the cystoscopy room or in manipulating the various kinds of traction equipment, or in certain other skills, or of even performing catheterizations regularly—might well be adapted here by the words of Judge Rosenn in the *Angelo* case, *supra,* at page 1173,

"Even when viewed in the light most favorable to the plaintiffs, the evidence does not suggest that the plaintiffs performed any more than an insignificant part of the duties ever performed by any male in Heavy Assembly. The bald assertion that certain duties were transferred cannot support an inference that the totality of the work performed in the positions to which the duties were transferred required substantially the same skill, effort, and responsibility as the totality of the work performed in the positions from which those duties were removed. Plaintiff's proof on this issue was not sufficient to carry their burden."

The holding of the Circuit was that a showing of comparability of positions is not sufficient to give rise to an inference that those positions were "equal" as the term is used in the Equal Pay Act. At page 1173, Judge Rosenn said,

> "The Equal Pay Act comprehends a threshold requirement, evident in the legislative history and confirmed in the case law, that the *jobs* to be equated be substantially the same. The requirement of equality of job content inheres in the statutory term 'equal work'."

And at the same page, this was said,

> "The legislative debates on the Equal Pay Act, however, manifest the congressional concern that the Act not be invoked to mandate equality of pay for jobs of different content."

As relates to training and instructive skill by experts in the specific specialties as related to the treatment of human ills and of giving them comfort under the circumstances, I look not only to the physical capabilities of those instructed and trained but as well to the knowledgeability and thought processes in job performance. In this connection what is quoted at page 1175 is pertinent,

> "But if the primary content of the compared positions were in fact substantially the same, then it would seem unnecessary to have to balance mental against physical effort to support the conclusion that the total effort involved was substantially equal; equal effort on jobs having substantially the same primary content would seem to mean substantially equal mental effort and substantially equal physical effort."

The plaintiff cites in support of his contention that the nurses aides and the orderlies in the instant case performed equal functions. In the case of *Hodgson, Secretary of Labor, et al. v. Brookhaven General Hospital*, 470 F.2d 729, C.A. 5, 1972, the Court found that the "orderlies did not expend significantly greater effort in performing primary, secondary or tertiary duties . . . that orderlies and aides expended substantially equal effort in per-

forming all their duties, however divided and ranked." (at page 730). This case is a second appeal from that originally reported in *Hodgson v. Brookhaven General Hospital*, 436 F.2d 719, 725, C.A. 5, 1970. There was revealed the fact that the defendant was a small hospital and aides and orderlies care for approximately the same number of patients; that both aides and orderlies "may be assigned patients of the opposite sex"; that "there are more aides than orderlies and when there is no orderly on duty the aides perform the more intimate services for male patients"; that orderlies perform male catheterizations, but that only a significant portion of an orderly's time is spent in performing catheterization; and that orderlies "compress into 75% of his working time the routine patient duties which occupy something like 98% of the working time of the typical aide". The defendant thus contended that orderlies are entitled to greater pay because they "do a significantly greater volume of work". The Court of Appeals remanded the case for further findings on whether the "routine patient duties are exacting in terms of skill, effort, and responsibility as the outside duties", specifically for supplemental and specific findings of fact on the question, whether the jobs of orderly and aide demand equal effort; whether pay differentials are justified in terms of the exceptions enumerated in 29 U.S.C. § 206(d); and for the taking of further testimony on these issued, if desired by either the Court or the parties.

The second appeal of *Hodgson v. Brookhaven, supra,* affirms the finding that the orderlies did not expend significantly greater effort in performing their duties, their primary, secondary or tertiary duties, and both orderlies and aides expended substantially equal efforts in performing all their duties. So, too, the fact that the orderlies in *Brookhaven*, on occasion, performed catheterization, which was only incidental would not justify the wage differential. Accord *Shultz v. Brookhaven General Hospital*, 305 F.Supp. 424 (N.D.Tex.1969); *Wirtz v. Basic, Inc.,* 256 F.Supp. 786 (D.C.Nev.1966); 29

C.F.R. 800.100 et seq. From all of this it is obvious that the facts and findings in *Brookhaven General Hospital* cases, *supra*, do not support the plaintiff in the instant case.

However, the second *Brookhaven* case, *supra*, reminds us of a very important principle which that Court had provided in a recent decision in *Hodgson v. Golden Isles Convalescent Homes*, 468 F.2d 1256, C.A. 5, 1972, to this effect:

" 'These issues must be decided on a case-by-case basis under the facts of each case. They cannot be decided on an industry-wide basis. All aides in all hospitals do not perform identical functions. Nor do all orderlies in all hospitals perform identical functions. The functions for each classification may not even be substantially equal in different hospitals. The differences or similarities in each case must determine the ultimate outcome under the Equal Pay Act.' " *Hodgson v. Brookhaven General Hospital*, supra, at page 730.

In addition to the foregoing, considerable guidance is presented in the *Golden Isles* case, *supra*, and bears repetition here as it points to the similarity in that case with the instant case of Washington Hospital. Accordingly, it is here recited for convenience:

"The number of patients typically ranges from 78 to 84, most of whom are women. The defendant usually employs 33 or 34 aides and 3 to 4 orderlies, although during one period of several months only one full-time orderly was employed. The Secretary, contending that aides and orderlies perform substantially equal work, seeks to have both groups paid at the same rate.

. . . . .

The Department of Labor apparently seeks to obtain a conclusive determination by the courts that, in hospitals and nursing homes across the country, aides and orderlies perform equal work. An *amicus curiae* brief informs us that numerous federal court actions throughout the country involve the 'identical' issue raised in this case, i. e., whether nurse's aides perform work 'equal' to that of orderlies, within the meaning of the Equal Pay Act of 1963. Some of these cases have decided in favor of the hospital. E. g., *Hodgson v. Good Shepherd Hospital*, 327 F.Supp. 143 (E.D.Tex.1971); *Hodgson v. William and Mary Nursing Home*, 65 L.C. ¶ 32,497 (M.D.Fla.1971); and *Shultz v. Royal Glades, Inc.*, 66 L.C. ¶ 32,548 (S.D.Fla.1971). Some have decided that the work of the orderlies and aides in the hospitals under consideration are equal. E. g., *Shultz v. Brookhaven Hospital*, 305 F.Supp. 424 (N.D.Tex.1969); reversed and remanded *sub nom. Hodgson v. Brookhaven General Hospital*, 436 F.2d 719 (5th Cir. 1970), on remand, 65 L.C. # 32,520 (N.D.Tex.1971); *Hodgson v. George W. Hubbard Hospital*, 351 F.Supp. 1295 (M.D.Tenn.)." (at pages 1257–1258)

Thereupon the Court ruled that these issues must be decided on a case-by-case basis, because not all orderlies and all nurses aides in all hospitals perform "identical functions" and therefore the function classifications "may not even be substantially equal in different hospitals". Thus, it concluded "the differences or similarities in each case must determine the ultimate outcome under The Equal Pay Act."

It then stated,

"For example, *Brookhaven* and *Hubbard*, *supra*, involved different facts than those found at Golden Isles. In *Brookhaven*, where there was a larger number of orderlies than in the case at bar, the court found that both orderlies and aides were assigned equal numbers of patients, that the primary duties of aides and orderlies were the same, and that the secondary and tertiary duties which were thought to distinguish the jobs either did not differ significantly from the primary responsibilities or were performed by aides as well as orderlies. In *Hubbard*, the proof showed that both female nurse's aides and male nurse attendants performed and assisted each other in performing as a unit, without regard to job classification, the task that the employer contended

were performed only by the orderlies. Neither *Brookhaven* nor *Hubbard* presented the precise configuration of job functions and employee performances found at Golden Isles.

The legislative history of the Equal Pay Act underscores the necessity of case-by-case analysis. By substituting the term 'equal work' for 'comparable work', which was originally suggested, Congress manifested its intent to narrow the applicability of the Act. Cong.Rec. Vol. 19, Parg. 7 (88th Congress, 1st Sess.), at 8866, 8892, 8913–8917, 9192–9218, 9761–9762, 9854 and 9941. This legislative history is discussed extensively in *Hodgson v. William and Mary Nursing Home*, 65 L.C. ¶ 32,479 (M.D.Fla.1971). It is not merely comparable skill and responsibility that Congress sought to address, but a substantial identity of job functions.[22]

"Furthermore, Congress intended to permit employers wide discretion in evaluating work for pay purposes. In the House Subcommittee Report on the Equal Pay Act, 109 Cong.Rec. 9209–9210 (1963), examples were debated to illustrate that a wage differential can be justified for employees who are available to perform an important differentiating task even though they do not spend large amounts of time at the task. Again, this approach requires examination of equal work claims in the light of particular employment." (at page 1258)

In the case of *Hodgson v. George W. Hubbard Hospital*, 351 F.Supp. 1295 (M.D. Tenn.1971), like *Brookhaven* and *Usery* is of no help to the plaintiff, because *training for aides and attendants was essentially the same; the routine patient care was essentially the same; the female nurses aides and the male nursing attendants were assigned to do and perform essentially the same routine patient care, and both nurses aides and nurse attendants performed and* assisted each other in their tasks. Accordingly, it was held that the work of the female nurses aides and the male nurse attendants was substantially equal in terms of skill and responsibility.

The question is not necessarily[23] how much more work the orderlies or the nurses aides do, but rather what if any difference is there in content between the two jobs. Does one have more skill and competence, acquired by instruction and training, than the other has? Or does one have a responsibility, vital to the needs of ailing human beings, which the other does not have? This is the concern of the law.

Are the 200, more or less, nurses aides who assist primarily the registered nurses doing equal work with the registered nurses? Is the registered nurse doing equal work with—perhaps even more laborious than—the doctors, and are they not entitled to doctor's pay?

For that matter, then, if all are doing the equal work of tending to the sick and ailing in a hospital, should not the nurses aides be entitled to equal pay with the doctors? No one will argue that the contents in the various jobs of nurses aides, registered nurses and doctors are not equal? Why? Because a doctor learns skills, competences and responsibilities over a period of years from knowledgeable training teachers in the science of medicine; because a registered nurse learns his or her skills, competences and responsibilities over three or more years from knowledgeable training teachers; and because a nurses aide at Washington Hospital learns hospital duties over a period of two weeks from, and two weeks training under, but not independently of, registered nurses whom they will be required to "aid" but not for whom they will be required to substitute in the performance of technically critical treatments for the sick and ailing human beings who depend upon responsible hospital operatives.

---

22. Footnote added: This supports *Angelo v. Bacharach, supra.*

23. This alone could react unfavorably to the plaintiff since it is true that 27 orderlies attend to the particular needs of all the patients, as the registered nurses are assisted by 200 nurses aides more or less.

And especially in this case, because orderlies receive two weeks alone of preliminary instructions and thereafter no less than six months of actual floor training under reliably knowledgeable trainers such as the head orderly, a urologist and an orthopedic surgeon and others. And because, even afterwards, certain probationary supervision is given them for the sake of checking them out for skills, competences and responsibilities in their limited performance of being able to, independently, perform certain duties, not in aid of the nurses but rather in "substituting" a doctor's functions in aid of the doctors.

## WORKING CONDITIONS

The matter of equality of working conditions must also be considered. This is so especially because the entire hospital, except the administrative department, would appear to have the same or similar working conditions which treat ailing human beings. The treatment accorded in each department, however, is different. The required skills are different. While there may not be too much difference between the surgery departments and the obstetrical department, there is a vast difference between the central supply room and the actual patient's room, where nurses aides work, where registered nurses work, and where the orderlies, hospital-wide in general, apply their specialized skills of catheterizations, traction devices and surgical preparations (except cystoscopies).

There is, also, a difference in the conditions between the orthopedic department where orderlies work and the other areas of the hospital, because the patients and the required treatments and conditions relating to all these are dissimilar but common to doctors, registered nurses, technicians, orderlies and nurses aides in that all look to the ultimate betterment and convenience of human beings. The matter of real importance for our consideration, then, is as it regards the content of the obligations as furnished by any or all of these as they relate to skills, effort and responsibilities to the patients to whom they assume those responsibilities, at the various places in the hospital.

## EXPERT WITNESS

The Secretary offered Bernard Gallagher as an expert witness. He testified to many matters but his greatest effort for persuasion was to the claim that nurses aides and orderlies do substantially the same work, and that as such the nurses aides were entitled to the same pay as the orderlies. I find no credibility in Mr. Gallagher's testimony.

As I said before, several Manor advanced nurses aides testified in their own behalf, but presented conflicting evidence which I could not accept as credible. Except for the Manor advanced nurses aides, not one of the several hundred nurses aides who served at Washington Hospital since 1970 testified to nurses aides fulfilling the services which the orderlies did and do. Neither were these Manor advanced nurses aides corroborated by the Director of Nursing or the Ancillary Supervisor, or the head nurses in charge of such services, on the various floors, where they may have served, nor by any doctor or even the registered nurses. In fact and particularly, many of the plaintiff's witnesses asserted, that the nurses aides at Washington Hospital not only did not perform the functions of the orderlies, but that they never did see a nurses aide at Washington Hospital do any catheterization, cystoscopy, surgical preps, cast bivalving, traction device placements and the like, even though they may have helped to hold a patient or piece of equipment when the traction and patient was being put into place by the orderly or the doctor.

So, even if the few former Manor advanced nurses aides who moved into Washington Hospital claimed to do such services on occasion in the early 1970's, it was at the most an occasional performance which did not constitute regular work. Incidental or occasional performance of a task does not classify it as one of content. *Wirtz v. Rainbo Baking Co. of Lexington*, 303 F.Supp. 1049, (D.C.Ky.1967); *Wirtz v. Koller Plastic*

*Products, Inc.*, 296 F.Supp. 1195 (D.C.Mo. 1968). If in fact an occasional former advanced nurses aide did perform catheterization or any unauthorized function, that did not automatically put all 200 or more aides in the class of such experts as the former advanced nurses aides claimed to be.

I notice also that Gallagher did not prepare Plaintiff's Exhibit 17, but that it was prepared by the plaintiff's counsel and that Gallagher accepted it as factual. Additionally, Gallagher admitted to a number of errors and also that there could be other "gross errors" in his reports.

The head nurse schedules what she wants an orderly to do, but the head nurse assigns an orderly on a weekly basis of who and where they are to function. In this regard, the orderlies have an independent responsibility and they are required to report what they have accomplished in their daily orderly duties to the particular nurse or head nurse, but that this may be anywhere in the hospital; whereas the nurses aides are fixed in a limited place for work under the head floor nurse.

While nurses aides are given to understand about various treatments they are not drilled and trained into treating patients for specific treatments as are the orderlies. Aides have a permanency in their placement, but orderlies do not as their duties take them everywhere in the hospital. Orderlies working in the orthopedic section always work under the direction of the orthopedic surgeon. A large number of nurses aides agree with the orderlies that the work of the orderly is not identical with that of the nurses aides—except for those who were advanced nurses aides and who testified that they aid the professional nurses and helped orderlies in setting up traction. But helping is not setting up, and the helping was not a function which had to be approved by the orthopedic surgeon as was the work of the orderly in setting up the transaction devices.

Thus, practically all the credible evidence in the case gives no support to Gallagher's expert opinion. As in *Angelo, supra,* at page 1173, Gallagher's testimony was insufficient to prove job equality between the orderlies and the nurses aides, "and indeed, tended to highlight the significant differences in the essential elements of the jobs he had examined," particularly by his own admissions of reliance and errors.

## UNION

While evidence was introduced relating to various classifications in pay of hospital employees in accordance with a Union Agreement, in considering the question of whether instruction, training and resultant skills and responsibilities achieved in the Group 2 and Group 3 hospital employees, it is not appropriate that we consider the bargaining agreement entered into by the Union with the hospital, because the law does not permit union activity to strip individual employees of rights and opportunities under their statutory entitlements under Title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963. These cannot be bargained away, either by the Union, by the employer, or by both acting in concert. *Laffey v. Northwest Airlines, Inc.,* 185 U.S. App.D.C. 322, 567 F.2d 429, 1976. Accordingly, I gave no serious consideration to the classes of employees as were agreed upon by the plaintiff and the employees' union, as such now relates to nurses aides and orderlies.

## SEX DISCRIMINATION

The plaintiff, in reality, charges the defendant with sex discrimination in the selection and hiring of orderlies and nurses aides. The burden is, also, on the Secretary to establish a prima facie case that the wage differentials represent "discriminat[ion] on the basis of sex." *Schultz v. Wheaton Glass Co., supra; Hodgson v. Corning Glass Works, supra.* He argues that the orderlies are "all male" and the nurses aside are "all female". This is done, I presume, for the purpose of raising an inference that the females were precluded from joining the orderly club and males were precluded from joining the nurses aides club, thus keeping exclusivity within each categorical group. The fact that all

orderlies are male and nurses aides are female will not determine the ultimate outcome of equality of jobs. Rather it must be the differences or similarities of functions performed by each which will govern. *Brennan v. Inglewood, Inc.*, 412 F.Supp. 362 (D.C.1975).

The present plan of selecting Group 2 nurses aides and Group 3 orderlies has been in effect since January 1, 1971, and did not designate or consider sex in the consideration of these employees as the plan was set up. After notices were posted in the hospital of job openings and selections, very few males applied for Group 2 nurses aide jobs and very few females applied for Group 3 orderly jobs. From July 23, 1971 to May 18, 1975, 358 nurses aides were employed and 66 orderlies. As of May 18, 1975, 203 nurses aides were employed and 66 orderlies.

At trial time, the hospital employed between 195–205 nurses aides and 25 to 28 orderlies. While the plaintiff argues that the nurses aide program had always excluded males, and the orderly program had always excluded females, the facts are that while by custom it seems that each of these may have been looked upon by males and females as class exclusion and that some vague evidence by the plaintiff was that females were dissuaded from making application for orderly positions, from an examination of all the evidence in the case as a whole I am not persuaded that this is factual.

The evidence is that all posted qualifications inviting applications for each of these jobs of nurses aides and orderlies, when they became open, showed no evidence of discrimination. Each notice was publicized indiscriminately without mention or reference to male or female. Only one or two witnesses, called by the plaintiff, asserted that there was some comment by unidentified persons that nurses aides would not be accepted as orderlies, but this evidence is highly unsubstantial and contradicted and I am not convinced from all the testimony as a whole that this was factual. One woman did apply for an orderly position, but after Mrs. Roche explained to her what was ex-

pected of the orderly, the applicant, Susan Knestrick, decided that she was not interested.

Accordingly to Mrs. Roche, four males did join up as nurses aides. Two withdrew during the first two weeks of classroom training; one withdrew at the end of probation and returned to the Dietary position which he had formerly held; and the other was an aide for approximately four or five months when he bid successfully for an orderly job. Another female orderly was hired in 1977 for a Group 2 job.

The hospital also retains technicians classified in Group 4. These have specialized narrow skills, but the parties have not made these pertinent to the issue raised here of equality or lack of equality between nurses aides and orderlies.

It is the orderly who sets up the traction on the order of the doctor to the nurse, but it is the doctor who adjusts the traction, and accommodates to the patient's needs. While greater strength is a good quality in an orderly for the functions which an orderly performs, it is not necessarily a qualification, since it might be more easily managed by a powerful woman than a weak male. The fact that women are not physically as adequate as men in the performance of certain physical work is not a feature which may be used to distinguish job content. *Krumbeck v. John Oster Mfg. Co* 313 F.Supp. 257 (D.C.Wisc.1970). However, it is the physical strength necessarily involved which does seem sometime to prove unattractive to females, generally. Yet, this has not stopped one female from making application for the job of orderly, but the job did not prove so attractive as to persuade her against taking the nurses aide job instead. So, too, the length and character of training required to instill skills in the orderly seems to prove less attractive to the female than does that of nurses aides. This was evidently supported by the statistical fewness of the number of females who applied for or persisted in going though the training necessary to become an orderly. Otherwise from past practices, posting of notices and the ease with which females were permitted

to enter into the field of orderly jobs, there was no reason why females could not have been in the past, or cannot be now, orderlies at Washington Hospital.

Any number of nurses aide witnesses, including the former Manor advanced nurses aides testifying for the plaintiff, stated that they knew they could apply for the orderly job but never did so.[24] Theresa Budwesky, a Manor nurses aide in 1966, never bid for the job because of a "cut in pay". Shirley Meeks, a Manor nurses aide since 1965 never applied. Florence Dittrich, a nurses aide since 1972, knew she could apply but never did. Norene Coughenour, a nurses aide since 1966, knew she could apply but never did. Vera Fordyce, a Manor advanced nurses aide since 1966, was familiar with rights for applying but never bid the job.

All these circumstances would point to the fact that women themselves chose their own future roles at the hospital. Just why they chose as they did may have been because of their own feelings of past sex orientation and their yielding to habit, or, as one put it, to reduction in pay for novice orderlies, or because of the change in the character of employment or because of whatever other personal reasons; but whatever the reason the evidence is credible that women were not barred from applying for orderly jobs, at any time, nor men barred from applying for nurses aide jobs, at any time. I find accordingly that the defendant did not violate any law relating to sex discrimination.

I have intentionally provided some repetition here, but only for the purpose of clarifying such repetitions with either phase which is pertinent to the findings here made, as a whole.

After consideration of all of the evidence as a whole, I find that the plaintiff, the Secretary of Labor, United States Department of Labor, failed to produce sufficient credible evidence that the Group 2 nurses aides as employed by the defendant, Washington Hospital, were (1) entrusted with and did substantially equal work with the orderlies; (2) that the approximately 200 nurses aides and those in the past retained at Washington Hospital had ever received instructions and training equal to and comparable with those given Group 3 orderlies so as to make them capable of performing the same duties which the orderlies were required to perform; (3) that the Group 2 nurses aide at any time at Washington Hospital possessed equal skill, effort and responsibility under the same working conditions as did the orderlies at Washington Hospital; and (4) that Washington Hospital discriminated against females in the procurement of orderly jobs, or males in the procurement of nurses aide jobs. Because of the failure of the plaintiff to present the necessary evidence proving the required elements in this case, judgment will be rendered in favor of the defendant, Washington Hospital.*

The Findings of Fact and Conclusions of Law are incorporated in this Opinion in accordance with Federal Rule of Civil Procedure 52.

---

24. Even Bette Moyar, a Manor nurses aide since 1964 and Elizabeth Kelly, a Manor advanced nurses aide since 1966, who each said she could do "all that orderlies do", never applied for the Group 3 orderly job, since transferring service to Washington Hospital in 1970.

* On a previous occasion, a similar, but not identical, matter was brought before this Court. Hodgson v. Washington Hospital, 3 E.P.D.

(CCH) ¶ 8195 (W.D.Pa.1971). There, Judge William W. Knox, of this Court, rejected the defense that the pay-differential existed because of a seniority-merit system, coupled with a system which measured earnings on a quality of work basis. The employees involved in Washington Hospital I are not involved in the present dispute.